Bardahl International Corporation v. Commissioner.
Bardahl International Corp. v. Commissioner
Docket No. 1368-63.
United States Tax Court
T.C. Memo 1966-182; 1966 Tax Ct. Memo LEXIS 101; 25 T.C.M. (CCH) 935; T.C.M. (RIA) 66182; August 5, 1966
*101 1. Petitioner was availed of during its fiscal years 1957 and 1958 for the purpose of avoiding income tax with respect to its shareholders by permitting its earnings and profits to accumulate beyond the reasonable needs of its business and was liable for the accumulated earnings tax imposed by section 531, I.R.C. 1954, for those years. Accumulated taxable income for those years determined. 2. Petitioner was entitled to an accumulated earnings credit for each of its fiscal years 1956 and 1959 equal to its undistributed taxable income for each of those years, so accumulated earnings tax imposed by section 531, I.R.C. 1954, not applicable. 3. Petitioner is not entitled to deductions for depreciation, or for maintenance and utilities in excess of the amounts allowed by respondent, for the years 1958 and 1959, in connection with a personal residence formerly owned by its president and principal stockholder and acquired by petitioner in 1958. Joseph H. Trethewey, IBM Bldg., Seattle, Wash., for the petitioner. Richard H. M. Hickok, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in petitioner's income tax for the taxable *102 years and in the amounts as follows: Year ending
Nov. 30,
Deficiency
1956
$ 45,260.00
1957
22,351.66
1958
46,529.87
1959
31,058.20
Total
$145,199.73
Several adjustments proposed by respondent were agreed to by petitioner and are not issues in this case. Proper consideration for those adjustments will be given in the Rule 50 computations. The issues presented for our consideration are: (1) Whether in each of the years involved herein petitioner was availed of for the purpose of avoiding income tax with respect to its shareholders by permitting its earnings and profits to accumulate beyond the reasonable needs of its business instead of being divided or distributed so as to be liable for the accumulated earnings tax imposed by section 531, et seq., I.R.C. 1954; [1] and (2) whether, in each of the taxable years 1958 and 1959, petitioner is entitled to a deduction for depreciation and maintenance of a residence which was owned by petitioner and used primarily as the personal residence of the son-in-law of petitioner's principal stockholder, who was also an officer of the corporation. Findings of Fact Some of the facts have been stipulated *103 and the stipulations of fact together with the exhibits attached thereto, are incorporated and made a part of our findings by this reference. [2]
Petitioner Bardahl International Corp. (sometimes hereinafter referred to as International) was organized under the laws of the State of Washington in 1954. Petitioner filed its income tax returns for its fiscal years ending November 30, 1956, 1957, 1958, and 1959 with the district director of internal revenue at Tacoma, Wash. Petitioner's principal place of business is located at Seattle, Wash.
Bardahl Manufacturing Corp. (sometimes hereinafter referred to as Manufacturing) has been engaged in the business of manufacturing a lubricant additive known as "Bardahl" since the commencement of its business in 1939. From 1939 to 1955 it was also engaged *104 in the business of selling the Bardahl additive. Manufacturing was a pioneer in the oil additive business. During the years involved herein it also manufactured certain related products such as gasline antifreeze, engine cleaner, carburetor cleaner, a water pump lubricant, a lubricant for transmissions and differentials, and an outboard motor oil. Pursuant to a contract executed by International and Manufacturing on January 1, 1955, Manufacturing agreed to undertake the production of Bardahl concentrate, which is the basic ingredient that is blended with oil to produce the Bardahl additive. Manufacturing also undertook responsibility for the quality control of its oil additive and for conducting research and development with a view to producing new products. Manufacturing further agreed to sell its entire production to International which in turn undertook the responsibility of acting as the sole sales representative of Manufacturing. International, at all times here material, was exclusively a sales organization and undertook no manufacturing or production activities. It distributed Bardahl concentrate during the years in question to various blenders and distributors located in the *105 United States and in foreign countries with which it had executed franchise contracts. The blenders purchased the Bardahl concentrate from petitioner and blended it with oil to produce a marketable product which, after canning, was distributed to retail outlets and sold to consumers. The franchise distributors, on the other hand, purchased the finished Bardahl additive from petitioner or from blenders and sold it themselves. During the years involved herein neither Manufacturing nor petitioner had any capital investment in any of the blenders or distributors of Bardahl additive (with the exception of Bardahl International Oil Corp., S.P.A., an Italian corporation formed in 1959 on Manufacturing's behalf to manufacture concentrate in Europe). The blenders and distributors (except for Bardahl International Oil Corp., S.P.A.) during the years under review were wholly owned by individuals unrelated to either of the Bardahl corporations. They owned their own plants and equipment. During the taxable years in question petitioner operated on the west coast as a blender in much the same way as the blenders in the other parts of the country. At all times here material, Ole Bardahl, individually, *106 was the principal stockholder of both Manufacturing and International and also served as president of each corporation. The number of shareholders in International ranged from 17 in 1956 to 20 in 1959. Ole Bardahl, the president of International, and his wife, Inga, owned 88.39 percent, 88.38 percent, and 88.22 percent of the stock of International for the years 1956, 1957, and 1958, respectively. In 1959, 19.23 percent of the outstanding stock of petitioner was transferred to Bardahl Investment Corp. After this transfer, 68.99 percent of petitioner's stock was owned by Ole and Inga Bardahl. During the taxable years in question International and Manufacturing occupied space in the same building. International rented its office and warehouse space from Manufacturing. International occupied the art department which was located in the western one-third of the upper story of said building. About one-third of the upper story was used as a conference room, and the remaining one-third was used by Manufacturing. The rent which International paid to Manufacturing was based upon an amount per square foot determined by the fair market value of such space in the geographic area. International *107 had six or seven employees who performed its work exclusively and were paid by petitioner. Manufacturing had about 15 employees who worked only for Manufacturing and were likewise paid by Manufacturing. International and Manufacturing also employed several joint employees and they were generally used in the management field. Salaries of the joint employees were paid by International and Manufacturing on a "shared" basis. Manufacturing manufactured all the products sold by petitioner. As these products were manufactured during the month, they were delivered to petitioner and recorded in a perpetual inventory maintained by petitioner, at which time they became available to petitioner for delivery to its customers. At the end of the month, Manufacturing billed petitioner for the products delivered during the month. Under the contract between them petitioner was required to pay the purchase invoices to Manufacturing by the tenth day of the following month. However, in practice petitioner paid all of its other obligations first and paid Manufacturing when it had funds available. On several occasions during the period here involved petitioner gave Manufacturing notes in payment for its purchases. *108 These notes were paid in a relatively short time. Petitioner was not required to and did not borrow funds from outside sources to meet its obligations. As of November 30, 1955-59, petitioner owed Manufacturing for merchandise received in the following amounts: Year ending
Nov. 30,
Amounts
1955
$ 81,237.72
1956
99,031.60
1957
230,790.91
1958
235,781.95
1959
135,798.44 During the taxable period involved petitioner maintained its books and records on an accrual basis. Purchases of the petitioner were not posted to the general ledger each month. At the end of each fiscal year here involved the liability to Manufacturing for purchases was recorded in petitioner's general ledger and accrued. The average credit period extended International by Manufacturing, based upon a turnover of petitioner's accounts payable, was as follows: Year ending
Nov. 30,
Days
1956
33.13
1957
52.79
1958
47.71
1959
46.88
The Bardahl oil additive is a highly promotional product and is subject to rapid fluctuations in the market place. Petitioner's directors and officers felt it required extensive national advertising to create consumer demand. First Manufacturing and then International contracted for spot advertisements on television programs *109 in the United States and these have been successful in creating a nationwide image of the Bardahl name and product. The oil additive industry is a highly competitive business which includes numerous competing products. Among the products competing with the Bardahl additive were those marketed by Shell Oil Co., Dupont, General Motors Corp., Wynn Oil Co., Quaker State, and Chrysler Corp. During the taxable years in question petitioner's operating costs, exclusive of costs of goods sold, consisted mainly of advertising expenses. Under the terms of the contract between Manufacturing and International, Manufacturing reserved the right of dictating the advertising program for its products and it was also agreed that the expense of such advertising was to be borne by Manufacturing and International in such proportions as they might mutually agree upon. The blenders handling central and eastern United States under franchises from International paid for their own advertising time on television. International paid for the advertising in the western states in cooperation with the distributors. International also paid for magazine advertising, regular advertising, and television on the west coast. *110 The advertising budget for International was prepared after consultation with key executives of the corporation and was usually based on the amount of projected sales, usually 10 percent of the sales for the past year plus an additional $5,000-$10,000. Petitioner's advertising expenses during the taxable years involved herein were as follows: Year ending
Nov. 30,
Amount
1956
$200,978.10
1957
188,368.18
1958
215,771.03
1959
351,706.66
In considering how much cash could be paid out in dividends by International the directors took into account the advertising budget for the following year since the larger part of the amount earmarked for advertising was usually spent in February or March of the following year and it was necessary to pay the advertising bill on the tenth of the month following expenditure. There was also usually a lag between the time International was required to pay for its cooperative advertising and the time it collected the pro rata share of such cost from the distributors. Under the terms of the contract between International and Manufacturing, Manufacturing agreed to deliver to petitioner the Bardahl concentrate at a price of $6 per gallon and all other Bardahl products at *111 a price of 82 percent off of the retail or list price of said products, which prices were subject to negotiation depending on Manufacturing's cost of production. Under the contract International agreed to sell Bardahl products to distributors then under contract with Manufacturing at the prices described in such contract. International was given the right to make its own contract with other distributors from time to time but Manufacturing reserved the absolute right of fixing the price or prices at which its products should be sold by International and particularly the price at which International's distributors might supply said products to the users of Manufacturing's products and customers of International's distributors. International specifically agreed to require its distributors to faithfully observe the price at which Manufacturing's products were to be sold, either to dealers, jobbers, and particularly to the ultimate users thereof. In summary, under the contract Manufacturing had rather complete control over the cost of the goods it produced to International and also over the price at which International could sell the products to its distributors and/or the ultimate consumers. *112 Although Ole Bardahl was the controlling stockholder of both International and Manufacturing he did not, by himself, determine the price at which the Bardahl products would be sold, but relied upon the other officers of Manufacturing to assist him in making these decisions, which were usually based upon figures presented by a cost accountant. Petitioner's annual operating costs, including its costs of goods sold and its other operating costs (excluding depreciation and Federal income taxes) for the years here involved were as follows: Operating costs
(excluding
depreciation
Year
& Federal
ending
income
Costs of
Nov. 30,
taxes)
goods sold
Total
1956
$281,032
$1,375,189
$1,656,221
1957
279,120
1,411,771
1,690,891
1958
390,675
1,908,499
2,299,174
1959
525,736
2,170,703
2,696,439
Petitioner required working capital as of the end of each of the years involved in an amount at least sufficient to cover its reasonably anticipated cost of operating for a single operating cycle. An operating cycle for petitioner consisted of the period of time required to convert cash into inventory, inventory into sales and accounts receivable, and then converting sales and accounts receivable into cash by collection of accounts receivable. *113 The average period of time required for petitioner to turn over its inventory (computed by dividing the annual cost of goods sold by the average inventory throughout the year) was 27.26 days in 1956, 23.78 days in 1957, 17.72 days in 1958, and 22.53 days in 1959. However, during certain months in each of the years it took longer than the average time for the turnover of petitioner's inventory. The average period of time it took for petitioner to collect its receivables during the years here involved (computed by dividing the net sales for the year by the average amount of receivables outstanding throughout the year) was 48.99 days in 1956, 57.66 days in 1957, 57.12 days in 1958, and 48.67 days in 1959. Here again during certain months of each of the years involved it took longer to collect petitioner's receivables than the average period for collection. The average period of time it took to complete an operating cycle of petitioner, as above described, was 76.25 days in 1956, 81.44 days in 1957, 74.84 days in 1958, and 71.20 days in 1959. The peak month in each of the years, being the month in which the total of the days required for turnover of inventory and days required for collection *114 of receivables was greatest, was June for the year 1956 in which the total period was 90.09 days, June 1957 in which the total was 114.43 days, September 1958 in which the total was 93.45 days, and also June 1959 in which the total was 82.59 days. A summary of the number of days contained in an average operating cycle of petitioner during the years here involved (also reduced to a decimal part of a year) and of the number of days contained in a peak operating cycle of petitioner during the years here involved (also reduced to a decimal part of a year), and the average credit period extended petitioner by Manufacturing during each of the years, in days and decimal parts of the years, is as follows: Average operating cycle
Peak operating cycle
(exclusive of
(exclusive of
credit period)
credit period)
Average credit period
Year
Days
Decimal
Days
Decimal
Days
Decimal
1956
76.25
.2089
90.09
.2468
33.13
.0908
1957
81.44
.2231
114.43
.3135
52.79
.1446
1958
74.84
.2050
93.45
.2560
47.71
.1307
1959
71.20
.1951
82.59
.2263
46.88
.1284
Petitioner required working capital as of the end of each of the years in question in an amount at least sufficient to cover its reasonably anticipated cost of operating for a single peak operating cycle, *115 being the period of time comprising the peak operating cycle as shown above less the credit period extended petitioner by Manufacturing. Accordingly the amounts of working capital reasonably anticipated by petitioner as being necessary to finance its cost of operations were as follows: Year ending
Nov. 30,
Amount
1956
$259,000
1957
287,000
1958
288,000
1959
264,000
It was the partice of petitioner during the years involved to invest substantial amounts of its liquid funds in temporary securities, such as Government bonds, to earn a small amount of interest but still have the funds immediately available when needed for the demands of its business operations. At the end of the years involved herein, petitioner held State, municipal, and Federal bonds as follows: Year ending
Nov. 30,
Amount
1957
$123,547.09
1958
148,609.34
1959
202,098.89 In fact, petitioner was not required to cash these bonds to pay taxes, dividends, or indebtedness during the years here involved and the bonds were normally held from the date of purchase until maturity. During 1958 and 1959 petitioner made investments in the stock of Sunset Mines, Inc., a business unrelated to petitioner's business whose stock was listed on the Spokane, *116 Wash., stock exchange, in the amounts of $24,563.80 and $13,629.87, respectively, in the total amount of $38,193.67. In April 1958, Ole Bardahl sold his personal residence to petitioner for approximately $100,000, evidenced by a demand note, bearing 4-percent interest, from petitioner payable to Bardahl in the amount of $84,847.61, and the assumption by petitioner of a mortgage in the amount of $15,152.39. This residence was thereafter used by Ole's son-in-law and daughter as their home, as hereinafter discussed. The current assets and current liabilities of petitioner on November 30 of each of the years here involved were as follows: Current
1956
1957
1958
1959
assets
Cash
$218,261.16
$150,316.08
$258,531.35
$ 66,994.59
Notes and
271,284.59
331,229.35
410,603.71
384,351.69
accounts
receivable
Inventories
67,008.40
59,455.28
40,157.37
30,309.48
Bonds
123,547.09
148,609.34
202,098.89
Prepaid
30,301.40
37,626.58
56,420.60
67,122.93
expenses
Total current
$586,855.55
$702,174.38
$914,322.37 [1]
$750,877.58 [1]
assets
Current
liabilities
Accounts
$ 99,031.60 [2]
$230,790.91
$153,994.78
$135,798.44
payable
Notes payable
166,634.78 [3]
Accrued
28,699.93
34,707.27
65,468.96
67,609.18
expenses
Federal
178,618.75
87,388.10
172,035.98
118,615.31
income tax
Current
liabilities
Cash
$ 30,000.00 [4]
$ 30,000.00
$ 30,000.00
$ 39,000.00
dividends
payable
Deposits of
5,223.60
shares
Total current
$336,350.28
$382,886.28
$588,134.50
$366,246.53
liabilities
Working
$250,505.27
$319,288.10
$326,187.87
$384,631.05
capital
*117 The ratio of petitioner's current assets to current liabilities for the years here involved was as follows: Year
Ratio
1956
1.7:1
1957
1.8:1
1958
1.6:1
1959
2.1:1
Petitioner's accumulated earnings and profits for the years here involved and a summary of some of the information set out above are reflected in the following table: Net liquid
Ordi-
Increase
assets
nary
Accumu-
in earn-
available
oper-
lated
ings and
to meet
ating
Year
earn-
profits
antic-
expenses
ending
ings
over
ipated
for one
Anticipated
Nov.
and
prior
business
business
extraordinary
30,
profits
years
needs
cycle
expenses
1955
$100,982
1956
247,891
$146,909
$250,505
$259,530
1957
316,674
68,783
319,288
287,452
1958
453,131
136,457
326,187
288,086
1959
531,830
78,699
384,631
264,261
$250,000-300,000 [1] *118 Total
needs
of busi-
Excess
Loans
ness for
(or
Invest-
unre-
Year
liquid as-
short-
ment in
lated
ending
sets (Col.
age) of
unrelated
to
Nov.
4 plus
working
proper-
busi-
30,
Col. 5)
capital
ties
ness
1955
1956
$259,530
($ 9,025)
1957
287,452
31,836
1958
288,086
38,101
$128,258
1959
514,261
(129,630)
141,888
Petitioner's net sales, net income before taxes, Federal taxes paid, net income taxes, and cash dividends declared (both in dollar amounts and percentages) from 1955 through 1959 were as follows: Percent of
Net
Federal
Cash
net income
Year ending
income
taxes
Net
dividends
distributed as
Nov. 30,
Net sales
before
paid
income
declared [2]
cash dividends
taxes [1]
after
taxes
1955
$1,489,286
$217,637
$107,671
$109,965
1956
2,029,458
373,498
188,719
184,779
$40,000
21.65
1957
1,901,824
213,054
105,288
107,766
30,000
27.84
1958
2,638,327
344,466
173,622
170,844
30,000
17.56
1959
2,967,164
274,279
137,125
137,154
39,000
28.44 In addition to the above cash dividends, petitioner declared stock dividends in the following amounts: Year ending
Nov. 30,
Amounts
1956
$ 40,000
1957
250,000
1958
90,000
1959
97,500
During each of the years here involved Ole Bardahl received the respective amounts of $37,500 and $75,000 as salaries from petitioner and Manufacturing. Inga Bardahl received salaries in the amounts of $3,000 from each of petitioner and Manufacturing (a total of $6,000) for the years 1957, 1958, and 1959. It was not customary for petitioner to make loans to *119 its officers or stockholders. If petitioner's retained earnings, as determined by respondent for each of the years involved, had been distributed in the same proportion as the dividends actually paid, Ole and Inga Bardahl would have been liable for the following amounts of additional personal income tax: Respondent's
Additional
Ole and
determination
income
Inga
of actual
to Ole
Bardahl
earnings
and Inga
additional
Year
retained
Bardahl
tax
1956
$146,129.86
$129,164.18
$107,331.30
1957
81,278.76
71,834.16
60,809.28
1958
146,504.78
129,246.52
108,886.42
1959
104,926.92
72,391.15
60,171.90
Petitioner's board of directors generally based its decisions on how much of the earnings and profits should be paid out in dividends at the close of each of the years here in issue upon the recommendations of its president, Ole Bardahl, and its secretary-treasurer, C. B. Merritt (now deceased). Bardahl Residence William G. Simpson, Ole Bardahl's son-in-law and an officer of petitioner during the years here involved, had been in the military service and had been stationed in Italy for 4 years as a NATO officer prior to his employment by petitioner. While on this tour of duty he had been entertained by many Europeans. When he was *120 employed by Bardahl he looked for a residence where he could entertain Europeans who visited Seattle. International did not have a large or impressive physical plant and Simpson thought it needed a showplace to impress its blenders and distributors, particularly those from Europe. Ole Bardahl owned and occupied as his residence an impressive house in Seattle which was located close to petitioner's office. It was decided that International should buy Ole's house and that Simpson should occupy the house and do all of the entertaining of foreign representatives who came to visit petitioner. In April 1958, Ole sold his residence to International in exchange for the assumption by that corporation of a mortgage in the amount of $15,152.39 and a demand note of International in the amount of $84,847.61, bearing 4-percent interest. In December 1958, Ole delivered the promissory note issued to him by petitioner to Manufacturing as partial payment of his drawing account balance for that year. The note for $84,847.61 was paid in full with interest on September 10, 1959, by International. The fair market value of the Bardahl house at the time of the transfer was $85,000. Ole Bardahl realized a *121 gain on the sale of the house which, however, was invested in a new personal residence for Ole and Inga within a year. [3]
The Bardahl house was occupied by Simpson and his family until 1962. During the years 1958 and 1959, Simpson entertained three or four customers of petitioner at the house. During 1958, Giorgio Geddes stayed at the residence overnight and in 1959, Geddes stayed in the house about a week or two and his cousin, Rodolfo Geddes, Mora, a blender from France, and Amedeo Totoro, an associate from Italy, also stayed in the house for short periods of time. After the cancellation of the Geddes' distributorship, infra, petitioner no longer operated in Europe and the need for entertaining foreign visitors diminished to practically nothing since Simpson was traveling in Europe instead of the Europeans coming to Seattle. During the years 1958 and 1959, petitioner paid the cost of maintenance and repairs of the Bardahl residence. For the year 1958 petitioner claimed a deduction of $1,418.39 for maintenance expense of this property, which respondent disallowed to the extent of $980 because *122 petitioner did not establish that the amount in excess of $438.39 represented an ordinary and necessary business expense. For the taxable year 1959, petitioner claimed a deduction of $2,194.54 for maintenance expense of the property, which respondent disallowed to the extent of $1,260 because petitioner did not establish that the amount in excess of $934.54 represented ordinary and necessary expenses of petitioner's business. For the years 1958 and 1959 respondent also disallowed a claimed deduction for depreciation on "a personal residence" (the Bardahl house) of petitioner in the respective amounts of $1,184.47 and $1,934.88. In 1962 Simpson moved from the house and it was placed on the market for sale. It was subsequently sold for $85,000 cash. The Geddes Lawsuit The Bardahl products were originally distributed in the foreign market under a franchise granted by Manufacturing to Alex Henderson, of Montreal, Canada, the first franchise distributor employed by the Bardahl interests. The European territory (except England and Scandinavia) for marketing Bardahl products, as well as the Far Eastern and South American territories, were under the control of Giorgio Geddes, of Italy, who *123 had originally obtained his franchise as a subdistributor from Henderson. Geddes had built up a distribution system for Bardahl products and had made his own contracts under which he sold the Bardahl oil additive concentrate to blenders and sold other Bardahl products to subdistributors. Geddes and his blender and subdistributor customers had invested their own funds in their plants and equipment and neither the petitioner nor any of the Bardahl interests had any investments therein. In May 1958, Simpson went to Europe to assist several European distributors in marketing Bardahl products and to investigate the general situation among the blenders and distributors there. On this trip he discovered that Geddes had been overcharging his blenders and distributors for the Bardahl concentrate, which violated not only his franchise agreement but also caused a violation of International's agreement with Manufacturing that it would be responsible for seeing that the Bardahl products were not sold to distributors in excess of the prices fixed by Manufacturing. Simpson discussed the matter with Geddes and Geddes agreed to meet with representatives of the Bardahl interests in the United States *124 to discuss the situation. Geddes and his attorneys met with Bardahl, Simpson, and their attorneys in Seattle in January 1959. In the latter part of March 1959, Bardahl and Simpson made a trip to Europe to investigate further the market conditions in Europe and the operation of the Geddes franchise. As a result of this trip, and for other reasons, Bardahl and Simpson decided that petitioner should not enter into any further contracts with Geddes and it was decided that Manufacturing should establish its own concentrate plants in Europe to manufacture and distribute the concentrate in Europe. In May 1959, petitioner's attorney notified Geddes' attorney in Seattle that there would be no renewal or extension of Geddes' contract or franchise, and petitioner canceled the European franchise distributorship of Geddes. On July 15, 1959, petitioner sent Geddes and Henderson letters formally terminating the European franchise. The actual termination of the franchise was held to be May 26, 1959, in the lawsuit filed by Geddes against petitioner and others in King County, Wash.
Following cancellation of Geddes' European franchise Simpson went to Europe to take steps to preserve the market for Bardahl *125 products. An Italian corporation, Bardahl International Oil Corp., S.P.A., was formed for this purpose, the stock of which was acquired by Manufacturing. In the fall of 1959 Manufacturing purchased from Geddes for $49,000 an inventory of concentrate bearing the Bardahl name to prevent a saturation of the European market with Bardahl products by Geddes. Thereafter the Bardahl products were manufactured and marketed in Europe through the Italian corporation owned by Manufacturing. Before cancellation of the Geddes franchise, the European market had provided approximately 15 percent of petitioner's total sales. On June 12, 1959, attorneys for Geddes in Seattle wrote petitioner's attorneys informing them of Geddes intention to litigate if the alleged brach of contract with respect to cancellation of the Geddes franchise and other related matters were not settled by the end of June 1959. There were no settlement negotiations between petitioner and Geddes between June 12, 1959, and September 27, 1960, although Geddes did successfully sue some of the blenders and distributors in Europe during that period for breach of contract. During this period Simpson and petitioner's accountants estimated *126 that Geddes would claim damages against International in the amount of $750,000, based on Geddes' profits during the 4 or 5 years preceding the cancellation of his franchise. The figures supporting this estimate were presented to the meeting of the directors of petitioner when they were considering the declaration of dividends for the year 1959 and were taken into consideration by them in connection therewith. On September 27, 1960, Geddes brought suit against International, Manufacturing, the Bardahls, and the Simpsons in the Superior Court of the State of Washington for King County for breach of contract, conspiracy, and libel, alleging damages against International in the approximate amount of $3 million. In 1963 the aforesaid lawsuit resulted in a judgment against International for breach of contract in the amount of $55,498.30. The suit was dismissed as to the other defendants. Petitioner paid attorneys' fees and costs in connection with this litigation in excess of $200,000. Ultimate Findings During its fiscal years ending November 30, 1957, and 1958, petitioner permitted its earnings and profits to accumulate beyond the reasonable needs of its business to the extent of $30,000 *127 and $100,000, respectively. The remainder of petitioner's undistributed earnings and profits after taxes for each of those years was retained for the reasonable needs of its business. In each of the years 1957 and 1958 Bardahl International Corp. was availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting its earnings and profits to accumulate instead of being divided or distributed. During its fiscal years ending November 30, 1956, and 1959, petitioner did not permit its earnings and profits to accumulate beyond the reasonable needs, including reasonably anticipated needs, of its business. Petitioner's undistributed earnings and profits, after taxes, for each of those years were retained for the reasonable needs of its business. The Bardahl residence purchased by petitioner from Ole Bardahl in 1958 was not properly purchased or used in petitioner's trade or business, and petitioner's expenses in connection therewith, to the extent disallowed by respondent, were not ordinary and necessary expenses of petitioner's business. Opinion The principal issue for decision is whether petitioner was subject to the accumulated earnings tax imposed by *128 sections 531, et seq., for any or all of the years 1956 through 1959; and, if so, the amount of the accumulated taxable income for each year upon which the tax is to be imposed, as determined under section 535. Section 531 imposes the tax on the accumulated taxable income, as defined in section 535, of a corporation described in section 532. Section 532 makes the tax applicable to every corporation, with certain exceptions not here pertinent, formed or availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. Section 533 provides that for purposes of section 532, the fact that earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid income tax with respect to its shareholders, unless the corporation shall prove to the contrary by the preponderance of the evidence. Section 534 provides that in any proceeding before the Tax Court involving a notice of deficiency based on an allegation that earnings and profits have been permitted to accumulate beyond the reasonable needs *129 of the business, the burden of proof, with respect to such allegation, shall be upon the Commissioner unless he has sent the taxpayer the notice provided for in subsection (b), and, if the taxpayer has submitted the statements provided for in subsection (c), shall be on the Commissioner with respect to the grounds set forth in such statement. Here, respondent sent taxpayer the notice provided in subsection 534(b) and petitioner did not submit the statement, provided for in subsection 534(c), of the grounds upon which it relied to establish that its earnings and profits had not been permitted to accumulate beyond the reasonable needs of its business, so the burden of proving that respondent's determination was in error rests squarely on petitioner. We conclude from all the evidence presented that petitioner has not proved by the preponderance of the evidence required by section 533 that, to the extent its earnings and profits were permitted to accumulate beyond the reasonable needs of its business, if any, it was not availed of for the purposes of avoiding income tax with respect to its shareholders. We therefore turn to the question whether petitioner's earnings and profits were permitted *130 to accumulate beyond the reasonable needs of its business. If they were, that is determinative of the purpose proscribed in section 532; but to the extent any undistributed earnings and profits of the taxable year are shown to have been retained for the reasonable needs of the business they become a part of the computation of the accumulated earnings credit under section 535(c), which is deductible from taxable income in determining the accumulated taxable income upon which the tax is imposed, as provided in section 535(a). The determination must be made with respect to each taxable year separately, but in determining the amounts necessary to meet the reasonable needs of the business for a particular year, consideration must be given to the earnings and profits accumulated in prior years. Sec. 1.535-3(b)(1)(ii), Income Tax Regs; Bremerton Sun Publishing Co., 44 T.C. 566. In approaching the problem of determining the amounts needed to meet the reasonable needs of petitioner's business, both parties rely basically on the approach used by this Court in Bardahl Manufacturing Corp., a Memorandum Opinion of this Court filed July 23, 1965 T.C. Memo. 1965-200), involving the accumulated earnings *131 tax asserted against petitioner's sister corporation and supplier for the same years here involved. This approach was recently approved by the Court of Appeals for the Second Circuit, in Apollo Industries, Inc. v. Commissioner, 358 F. 2d 867 (C.A. 1, 1966). We will also follow the same basic approach here, although we may take into consideration factors which we deem relevant and material here which may or may not have been relevant and material in those cases. The underlying principle involved in this approach is that the taxpayer should have sufficient liquid assets on hand to pay all of its current liabilities and any extraordinary expenses reasonably anticipated, plus enough to operate the business during one operating cycle. The starting point under this approach is to determine from the evidence presented the amount of the net liquid assets available to meet the reasonable needs of the business, which are considered for this purpose to be the cost of operating the business during one complete operating cycle plus such amounts as may be needed to meet any anticipated non-operating expenses of the business. In general, if the net liquid assets available at the end of the fiscal *132 year, when final dividends are being considered, are sufficient to permit a distribution of all of the current year's earnings and profits, after taxes and other adjustments provided by law, and still meet these anticipated needs for the future, it is considered unnecessary for the corporation to retain its earnings and profits for the current year and they are considered available for distribution as dividends. If the net liquid assets are not thus sufficient then it must be determined how much of the current year's earnings the corporation is justified in retaining to meet these needs. This approach provides a yardstick against which to measure the judgment of the officers and directors of the corporation in an effort to determine whether their decision to retain earnings and profits was motivated entirely by the needs of the business or was influenced by the desire to avoid a second tax on the corporate earnings at the stock-holder level. Other relevant factors must also be given due consideration, especially in determining the true purpose for accumulating earnings. But when we get to the point where we must determine the amount of the accumulated earnings credit under section *133 535(c), this approach would appear to be as good as any other to determine the reasonable needs of the business for purposes of the credit. It has the advantage of leaving room for consideration of many variables which may be applicable to the particular corporate situation which many so-called rules of thumb do not. In this regard, counsel for petitioner strongly urges that we consider petitioner entirely independently of its sister corporation, Bardahl Manufacturing Corp. For purposes of our decision here, we have viewed petitioner's business needs independently of the needs of its sister corporation, but we cannot ignore the manner in which petitioner and Manufacturing have actually done business with each other because we believe that has a direct bearing on the amount of capital and surplus required by petitioner to meet the reasonable needs of its own business. We have determined that as of the end of its fiscal years 1956, 1957, 1958, and 1959, petitioner had net liquid assets available to meet anticipated business needs in the amounts of $250,505, $319,288, $326,187, and $384,631, respectively. In this computation we have included in current assets all cash, cash equivalents *134 such as notes and accounts receivable and Government bonds, inventories, and prepaid expenses. We have not included petitioner's investment in the stock of Sunset Mines because we have little or no evidence of the purpose for which this investment was made and whether the officers and directors would have been willing to liquidate the investment rather than borrow money to meet current expenses if necessary. Nor have we included petitioner's investment in the Bardahl residence made in 1958. [4] In current liabilities we have included accounts payable, accrued liabilities including Federal income tax payable for the past year, declared dividends payable in cash, and other notes and liabilities payable within 1 year. While there are some differences in the amounts of working capital or net liquid assets the parties have computed were available at the end of several of the years, petitioner having arrived at somewhat larger amounts than respondent for the years 1958 and 1959, the only real disagreement between the *135 parties in this respect is whether prepaid expenses should be included in the computation. Petitioner claims that the prepaid expenses consist largely of inventories of advertising media, such as dealer aids, leaflets, etc., that these could not be used to pay dividends, and hence should not be included in liquid assets. We recognize this, but one purpose of the computation is to determine the cost of operating the business for one operating cycle and we have included the cost of advertising in that computation, so it seems proper to include prepaid advertising expense as a part of the assets available to meet those anticipated operating expenses - and we have done so. We note that petitioner also includes prepaid expenses in its computation of the current ratios of its current assets to its current liabilities. The principal differences between the parties lie in determining the length of the operating cycle to be used and what factors should be taken into consideration in determining the cost of running the business during that cycle. It is agreed that in a business such as petitioner's an operating cycle consists of the period of time starting when ncash is coverted into inventory, *136 then inventory is converted into sales and accounts receivable, and ending when cash is again realized upon collection of the receivables. This period of time is converted into a decimal portion of the year and the decimal is used to multiply the known cost of goods sold and other operating costs of a full year to determine the anticipated cost of operating petitioner's business during the one full operating cycle in the following year. The basic differences between the parties are: 1. Whether Federal income tax for the following year must be included in computing the cost of operating during one cycle, as claimed by petitioner; 2. Whether the peak month of the year should be used to determine the length of the cycle, as claimed by petitioner, or the average for the year, as claimed by respondent; and, 3. Whether the average credit period used by petitioner before it paid its accounts payable for purchases should be deducted in determining the length of the operating cycle, as claimed by respondent. First, with reference to the inclusion of income tax for the following year as a cost of operating during the cycle, we agree with respondent that it should not be included, and we have *137 not included it in our computations. In its computations petitioner has added to the cost of goods sold and other operating expenses the income tax actually incurred by petitioner in the subsequent year as taken from the corporate return for the subsequent year. Federal income taxes would be incurred in the following year only if there are sufficient earnings from future profitable operations to require their imposition and we do not believe this is the kind of operating expense for which cash is needed in advance. These taxes would not normally have to be paid until after the profits are earned and, for the most part, received. Using hindsight, as petitioner would have us do, and looking at the subsequent year's tax returns of petitioner, it appears that in each of the years before us only a small part of the total tax liability shown to be due on the returns was paid prior to the time the returns were filed. We have provided for payment of the lump-sum taxes due with the returns by including them in current liabilities in computing the excess of net liquid assets available as working capital. The latter is what was done in Smoot Sand & Gravel Corporation v. Commissioner, 274 F. 2d 495, *138 affirming a Memorandum Opinion of this Court, relied on by petitioner, rather than making provision for anticipated future taxes. To include both accrued taxes and future taxes in the computation would be unrealistic. [5]
Second, we agree with petitioner that reasonably prudent businessmen, in considering the cash needs of a business such as this, would take into consideration the fact that the business had peak periods during the year when cash was tied up in inventory and receivables for longer periods than usual, and would be justified in accumulating sufficient net liquid assets to meet the needs of the business during this peak period, rather than just an average operating cycle. It is true that determining the reasonable cash needs of a business by this approach involves somewhat of an averaging concept and it is apparent from an analysis of the turnover of petitioner's inventories and receivables that to use the peak month each year rather than the average for the entire year will distort the picture of the cash needs of this business during most of the time, but we cannot *139 say that making provision for such a peak period would be unreasonable or unlikely on the part of the officers and directors of this corporation in determining the reasonable needs of its business. Third, we agree with respondent that consideration should be given, particularly under the circumstances existing here, to the length of time petitioner's accounts payable for the purchase of inventory remained unpaid; in other words the average period of credit extended petitioner by Manufacturing, its supplier. In this approach to determining the reasonable needs of petitioner's business we are trying to determine, among other things, how long petitioner's cash will be tied up in inventory and receivables, on the assumption that petitioner needs at least enough cash or cash equivalents to cover its cash requirements during that period of time if it had no receipts. We see no reason why this calculation should start until petitioner has to put up cash to pay for its inventory. The inventory can be used to start the cycle when it is received by petitioner but the length of the cycle is reduced by the lag between the time petitioner receives the inventory and has to pay for it. It is theoretically *140 true that the supplier might demand payment on delivery of the goods to petitioner and this would eliminate this lag, but we cannot close our eyes to the realities of the situation here and what actually took place. The contract between petitioner and Manufacturing required petitioner to take all of Manufacturing's production, title to pass at time of delivery (which was as the product came off of the production line) but petitioner was not required to pay for the goods until the tenth day of the following month. Thus the contract alone provided petitioner with use of the inventory for a considerable time before being required to pay for it. In actual practice petitioner was apparently not required to pay for its purchases until well after the tenth day of the following month. The weighted average of the credit period extended petitioner for purchases of inventory ranged from 33 days in 1956 to almost 53 days in 1957. In fact, petitioner's officers testified that petitioner paid all of its other creditors first and then paid Manufacturing when it had the money to do so. There is little reason to think this practice would suddenly be changed under the circumstances. A comparison of *141 the month in each of the years when petitioner's accounts payable were outstanding longest coincides rather closely with the peak months of petitioner's operating cycle. We realize that use of the credit period extended to petitioner by Manufacturing in computing the operating cycle does not take into account the fact that petitioner probably had to pay its other operating expenses in less time and hence would have those dollars tied up for a longer period of time. While we have given consideration to this factor in arriving at petitioner's need for working capital, we believe the use of the peak month for computing petitioner's operating cycle compensates for this in a large measure. The same is true of the period of time petitioner's witnesses referred to for "float"; i.e., the time it takes for a check received by petitioner to clear the bank upon which it was written so the cash would be available to petitioner. Petitioner emphasizes that the products it sold were highly competitive and volatile pricewise and that it was required to do a lot of advertising to sell its products. From this petitioner argues that it needs a rather large amount of cash on hand at the beginning of each *142 year to pay for its advertising budget which usually had to be paid out in February and March of each year, before it realized any benefits therefrom. We think adequate credit is given for this factor by the inclusion of petitioner's cost of advertising in the anticipated cost of operating petitioner's business for a complete operating cycle. We also believe petitioner was somewhat protected from the dangers of price changes in the products it sold and in its advertising expenses by the terms of its contract with Manufacturing. The prices at which petitioner could buy the products were subject to negotiation with Manufacturing, as was the share of the advertising expense that was to be paid by each. Petitioner had little other overhead or selling expenses and it seems rather unlikely that petitioner could have failed to operate at a profit absent a catastrophe or a complete breakdown in the collection of its receivables. Giving due consideration to the above factors and to all the arguments of the parties we have determined and found as facts that petitioner's operating cycle was approximately 57 days in 1956, 62 days in 1957, 46 days in 1958, and 36 days in 1959. Translating these *143 periods into decimal parts of the years and applying these to the total cost of goods sold and operating costs of the various years, we have determined that petitioner's anticipated operating expenses of one business cycle were approximately $259,000 for 1956, $287,000 for 1957, $288,000 for 1958, and $264,000 for 1959. We have no evidence that petitioner had reason to anticipate any extraordinary expenses in any of these years, except for the Geddes suit in 1959. Petitioner had very little in the way of fixed assets and it did not need them under its method of operation. However, we are convinced by the evidence that petitioner had a real reason to be concerned in November 1959 about the cost of defending a breach of contract suit by Geddes and the damages it might have to pay as a result thereof. Geddes had already successfully sued some of his distributors and we see no reason why petitioner's directors should consider as an idle threat Geddes' previous threat to sue petitioner. Whether or not petitioner's cancellation of the Geddes contract was for the benefit of Manufacturing to permit Manufacturing to enter the European market with its own concentrate plants is of little moment, *144 because in any event petitioner stood the risk of being held liable for damages for breach of contract. We believe that this potential liability must be considered as a reasonable need of petitioner's business. Comparing the reasonable needs of petitioner's business, as determined by the above approach, with the net liquid assets available to petitioner to meet those needs without borrowing, we conclude that in computing petitioner's accumulated taxable income under section 535 for the year 1956, petitioner is entitled to an accumulated earnings credit in an amount at least equal to its undistributed taxable income for that year, so it is not liable for any accumulated earnings tax for that year. We reach the same conclusion with respect to petitioner's fiscal year 1959, despite the fact that for some unexplained reason petitioner increased its investment in Sunset Mines, an apparently unrelated venture, by about $14,000. The situation was different for the years 1957 and 1958. As of November 30, 1957, petitioner could anticipate a need for approximately $287,000 to meet the reasonable needs of its business. It had available for that purpose, including its accumulated earnings and *145 profits from preceding years and undistributed profits for the year 1957, and after providing for the payment of the $30,000 declared dividend and all other current liabilities, the sum of approximately $319,000 in cash or its equivalent. This was more than enough to meet the reasonable needs of petitioner's business but had petitioner distributed all of its earnings and profits, after taxes ($107,766), in cash, it would not have had enough net liquid assets available for the working capital it needed. It would have fallen short by about $47,000 to $48,000. We have therefore concluded that petitioner was entitled to an accumulated earnings credit for the year 1957 in that amount and that it permitted its earnings and profits to accumulate beyond the reasonable needs of its business to the extent of $30,000 for 1957. Following the same line of reasoning we find that at the end of its fiscal year 1958 petitioner had an apparent need for approximately $288,000 in working capital; and that after making provision for payment of the declared cash dividends and meeting its other current liabilities it had net liquid assets in the amount of approximately $326,000, exclusive of the Sunset Mines, *146 Inc., stock. Petitioner reported earnings and profits for the year 1958 in the amount of $170,844, after taxes. If petitioner had distributed all of its earnings and profits for the year 1958, this would appear to have left petitioner short of liquid working capital to the extent of approximately $100,000. However, the corporation saw fit to invest approximately that amount in purchasing its principal stockholder's personal residence, in addition to investing about $24,000 in the Sunset Mines, Inc., stock. We are not convinced from the evidence that petitioner had any reasonable business need for the Bardahl residence. Possibly the directors felt that this investment was readily available to meet the needs of the business. While we believe petitioner was entitled to an accumulated earnings credit of about $40,000, we conclude that petitioner permitted its earnings and profits to accumulate beyond the reasonable needs of its business for the year 1958 to the extent of $100,000. In our consideration of this issue of the accumulated earnings tax we have not overlooked the fact that petitioner had consistently distributed as cash dividends during the years here involved between 22 percent *147 and 28 percent of its earnings and profits after taxes, and that this has been considered as convincing evidence that the corporation was not being availed of to avoid income taxes on its shareholders in some cases. Of course the percentage of payout of earnings and profits of one business might have no bearing at all on the reasonableness of the payout made by another business. A high profit, low overhead business would normally not have a need to retain as high a percentage of its profits for the needs of its business as would a low profit and heavy overhead business. So at best, the dividend history in terms of percentage of payout is only evidence to support a claimed lack of purpose to use the corporation to shield its stockholders from tax. Most of the evidence in this case is directed to the question of what were the reasonable needs of the business. While this evidence points up reasons the corporation needed to retain cash, there is very little evidence that these reasons were used by the directors in determining how much could safely be paid out in cash dividends. A finding that earnings and profits were accumulated in excess of the needs of the business leaves the record *148 almost bare of any evidence that this was not done to avoid tax on the stockholders - and this history of dividend policy is of little significance here. We have also given consideration to the fact that the ratio of petitioner's current assets to current liabilities was not excessively high. This latter factor is simply a rule of thumb which has at times been used as one factor in determining the reasonable needs of a business, but is entitled to little weight if an analysis of the actual needs of a particular business indicate a lesser need for working capital. Dixie, Inc. v. Commissioner, 277 F. 2d 526, certiorari denied 364 U.S. 827; Barrow Manufacturing Company v. Commissioner, 294 F. 2d 79, certiorari denied 269 U.S. 817. Deductions for Depreciation and Maintenance of Personal Residence Purchased from Ole Bardahl In 1958 petitioner purchased the personal residence of Ole Bardahl for approximately $100,000. The residence was thereafter occupied during the years here involved by William Simpson, vice president of petitioner, and his wife, a daughter of Ole Bardahl, as their home. The Simpsons entertained Geddes and several blenders of the Bardahl products at this residence *149 on several occasions during the years 1958 and 1959. Petitioner claimed deductions for depreciation and maintenance of the residence on its returns for 1958 and 1959. In his notice of deficiency respondent disallowed the entire deduction claimed for depreciation in both years and disallowed $980 of the $1,418.39 deduction claimed in 1958 for maintenance and utilities, and disallowed $1,260 of the $2,194.54 deduction claimed for the latter purpose in 1959. As previously noted we are not convinced by the evidence that the purchase and ownership of this personal residence served any necessary or useful business purpose of the petitioner corporation; and it was not held for the production of income. Consequently, petitioner is not entitled to a deduction for depreciation of this property. Section 167. Cf. American Properties, Inc., 28 T.C. 1100. Petitioner and Simpson apparently shared the cost of maintenance of the residence and the utilities used at the residence. Respondent has allowed petitioner a deduction for a part of these expenditures paid by it and has disallowed the balance claimed by petitioner. We find nothing in the evidence to indicate that respondent's allocation was *150 not fair and reasonable or to support any greater deduction for this purpose than allowed by respondent. Decision will be entered under Rule 50. Footnotes
1. All section references are to the 1954 Code unless otherwise indicated.↩
2. More details of some of the facts relevant to this case are set out in the findings of fact made by this Court in Bardahl Manufacturing Corp., a Memorandum Opinion of this Court filed July 23, 1965 (TC Memo. 1965-200↩), which are also supported by evidence received in this case. We do not believe the details are necessary for a decision in this case but reference is made thereto for anyone interested.
1. Does not include stock in Sunset Mines or the Bardahl residence purchased in 1958. ↩
2. Owed to Manufacturing. ↩
3. Owed to Manufacturing and includes the balance due on the note payable for the purchase of the Bardahl residence. ↩
4. The parties agree that the cash dividends declared for 1956 were $40,000 and that the cash dividends payable as of November 30, 1956, were $30,000.↩
1. For Geddes' lawsuit.
2. See fn. 4 to table of current assets and current liabilities, supra.↩
1. Per books. ↩
3. See Ole Bardahl, a Memorandum Opinion of this Court filed April 29, 1965, T.C. Memo. 1965-116↩).
4. The use of funds to acquire the Sunset Mines stock and the Bardahl residence is taken into consideration in determining the amount of the accumulated earnings credit, infra.↩
5. See Bardahl Manufacturing Corp., a Memorandum Opinion of this Court filed July 23, 1965 T.C. Memo. 1965-200↩).