W. L. MEAD, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
W. L. Mead, Inc. v. Commissioner
Docket No. 1688-72.
United States Tax Court
T.C. Memo 1975-215; 1975 Tax Ct. Memo LEXIS 163; 34 T.C.M. (CCH) 924; T.C.M. (RIA) 750215; June 30, 1975, Filed James V. Shindler, Jr., for the petitioner. James C. Lynch, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in the petitioner's Federal income taxes: Year
Deficiency
1967
$65,476.91
1968
15,058.37 The only issue for decision is whether the petitioner is liable for the tax under section 531 of the Internal Revenue Code of 1954[1] because it permitted its 1967 and 1968 earnings and profits to accumulate *165 beyond the reasonable needs of the business for the purpose of avoiding income taxes on its sole shareholder. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioner, W. L. Mead, Inc. (Mead), had its principal office in Norwalk, Ohio, at the time of filing its petition herein. It filed its Federal income tax returns on a calendar year basis for the years 1967 and 1968 with the District Director of Internal Revenue, Cleveland, Ohio. Mead kept its books and records by use of the accrual method of accounting and on a calendar year basis. Mead's sole shareholder and president was Wilmer L. Mead, who filed joint Federal income tax returns with his wife for the years 1967 and 1968, reflecting taxable income of $144,515 [2] and $134,950, respectively. Mead operates a motor freight business covering the New England region through Ohio to Chicago, Ill., under rights granted by the Interstate Commerce Commission (ICC). It transports all types of merchandise, but mainly *166 clothing and shoes. During 1967 and 1968, it had over 300 transportation vehicles and employed over 90 drivers. During those years, Mead's board of directors met almost daily to discuss Mead's operations. The meetings were informal and records were made only infrequently. Mead generally financed its operations through its earnings. It sought to avoid borrowing money and did so only during a recessionary period in the 1950's and after a fire in 1948 which destroyed a terminal and a significant amount of equipment. Mead was incorporated in 1947, and its annual operating revenues showed an almost steady increase from $113,141 in 1947 to $3,290,320 in 1966. In 1967 and 1968, its operating revenues and expenses, not including depreciation but including Federal income taxes, were: 1967
1968
Operating revenues
$3,543,954
$3,937,894
Expenses
3,240,051
3,572,050 Each year, Mead transferred its net income, after dividends, to its earned surplus account. It retained earnings of $160,330 in 1967. It paid no dividends until 1955; from 1955 through 1967, it paid annual dividends of $611, and from 1968 through 1970, it paid annual dividends of $1,007. The earned *167 surplus account of Mead increased from $6,127 at the end of 1947 to $1,928,080 at the end of 1966, and its year-end cash balances increased from $11,831 to $904,670 over that same period. At the end of 1967 and 1968, its earned surplus accounts, cash balances, and working capital [3] were: 1967
1968
Earned surplus account
$2,057,934
[4] $2,256,834
Cash balance
950,714
974,909
Working capital
969,829
1,039,956
During 1967, Mead's maximum amount of accounts receivable was $346,343; its average accounts receivable was $299,772 and average accounts payable was $213,380. During 1968, the maximum amount of accounts receivable was $419,769; average accounts receivable was $354,767 and average accounts payable was $175,807. During 1967 and 1968, Mead had average monthly fixed operating costs of $59,467. During those years, its monthly revenues and expenses were: 1967
Revenues
Expenses
January
$264,955
$257,863
February
275,421
264,030
March
317,260
311,673
April
257,338
269,6 74
May
296,927
297,547
June
308,909
285,819
July
252,435
255,375
August
336,541
227,083
September
304,201
288,807
October
348,211
307,723
November
312,879
270,543
December
268,876
252,957
1968
January
$288,762
$ 271,401
February
303,257
279,324
March
325,342
294,449
April
338,128
314,705
May
344,536
309,032
June
311,654
290,958
Jul y
292,883
282,764
August
374,673
309,315
September
344,582
303,546
October
399,322
331,569
November
335,513
304,331
December
279,242
217,674
*168 Mead's monthly cash balances ranged from $703,490 to $1,028,313 in 1967 and from $819,921 to $1,072,939 in 1968; such balances were from 2 to 4 times the amount of Mead's monthly expenses. Mead's employees were members of the Teamster's union, whose labor contracts were for 3-year terms. During the negotiations for new contracts, the Teamster's union often struck selected transportation companies; however, until the strike took place, the companies did not know which of them would be struck. In 1970, the Teamster's union labor contracts were renewed, and during the negotiations, many companies were struck and temporarily stopped doing business. In 1953 or 1954, Mead suffered a labor strike that lasted 91 days. The strike caused a revenue loss of $500,000, of which Mead was later reimbursed about $125,000 to $150,000. Mead purchased insurance policies covering public liability and loss and damage to its cargoes, with a $10,000 deductible for each coverage. It did not carry insurance policies on its buildings and equipment, since it considered the premiums for such insurance to be prohibitive. From 1963 through 1968, Mead's uninsured losses averaged $107,516 per year. Mead maintained *169 a checking account at a bank in Norwalk, Ohio, in which the balance of $100,000 remained undisturbed from 1954 through 1970. Mead's insurance carriers required such an account to ensure that Mead could pay any claims resulting from the deductibles under the policies. Mead did not report any insurance reserves on the annual financial statements it filed with the ICC. Mead had a policy of regularly replacing its equipment in order to reduce repair costs and to keep up with improvements in the equipment. It planned for such replacements 2 years in advance. Replacements were purchased as capital became available, and for the years 1966 through 1969, Mead projected that it would normally incur $175,000 yearly in replacement costs. After deducting trade-in allowances, Mead spent an average of $170,000 per year over the years 1963 through 1967, and $172,580 per year over the years 1963 through 1968, for equipment. In the late 1960's, State legislatures were considering changing weight limits on trucking equipment, thus permitting the use of diesel tractors. Mead knew about the proposed changes and intended to switch from gas to diesel equipment when allowed to do so, but it was unsure *170 as to when the changes in the legislation would take place. In 1969, Mead purchased more diesel equipment than it had hitherto purchased in any one year, although it also purchased some new gas equipment in that year. Diesel tractors cost approximately $16,800 to $17,000 in 1969. In 1964, Mead purchased certain transportation rights (Burnside rights) which extended Mead's service area from Norwalk, Ohio, to Columbus and Dayton, Ohio, and to Fort Wayne, Ind., and Chicago, Ill. Mead had freight terminals in Norwalk and Columbus, but in Dayton and Fort Wayne, it used cartage companies to make local deliveries and to transfer freight to connecting trucking lines. Mead contemplated building or buying a freight terminal in Dayton when it purchased the Burnside rights. However, had Mead acquired its own terminal at that time, or within 2 years thereafter, it would have been required to assume the labor contract of Burnside, which would have been very costly, and accordingly, Mead decided to delay such acquisition for 2 years. In 1966, Mead leased a terminal, which it continued to use until it built its own terminal. In that year, it also made some inquiries concerning the acquisition *171 of a site for its own terminal. Mead needed a site which was large enough to accommodate a terminal, which was accessible to highways, and which was near other trucking companies to facilitate the transfer of interline shipments. The terminal manager at Dayton investigated various parcels of land and submitted his suggestions to Mr. Mead, who was responsible for making the final decision whether to purchase land. Mr. Mead and the Dayton terminal manager corresponded 3 times in 1966 and once in 1968 regarding land for the terminal. On September 5, 1969, the board of directors authorized Mr. Mead to acquire land for the Dayton terminal. On September 8, 1969, Mead entered into a contract for the construction of a terminal for $89,836, and on November 18, 1969, Mead purchased land for the terminal site for $74,575. Mead spent an additional $15,157 on the terminal prior to moving in on May 22, 1970. When Mead acquired the rights permitting it to serve points beyond Fort Wayne, Ind., it entered into arrangements with other trucking companies to provide such service. Its agreement with Arrow Motor Transit, Inc. (Arrow), extended its service area to parts of Indiana and Illinois. Arrow's *172 terminal was located in Fort Wayne, and Mead leased office space in the terminal. Mead and Arrow had no written agreement covering their transportation and leasing arrangements, and such arrangements could have been terminated at any time. Occasionally, Mead and Arrow disagreed about the rates Arrow charged Mead, but since Mead depended on Arrow's services, Mead negotiated settlement of such disagreements. The arrangements were favorable to both companies and were continued at least to 1974. In 1967 and 1968, Arrow was financially unsound, and appeared to Mead to be insolvent. Mead knew about Arrow's financial condition and planned to build its own terminal if the arrangements with Arrow were ever cancelled. At some time after Mead and Arrow commenced their association, Arrow lost its terminal facilities and purchased land for a new terminal. In 1967, Mead purchased land adjoining Arrow's new terminal for $22,056. In 1966, Mead's terminal in North Reading, Mass., was taken by the Commonwealth of Massachusetts through eminent domain. A net condemnation award of $263,030 was paid to Mead on August 18, 1967; the award was included as a cash asset on Mead's 1967 balance sheet. As of *173 December 31, 1967, the estimated completion cost of a replacement terminal was $147,551, which amount was a reasonable business need as of such date. At the end of 1968, Mead also had a reasonable business need for $60,000 to expand its terminal at Norwalk, Ohio. In his notice of deficiency, the Commissioner determined that during 1967 and 1968, the petitioner had been availed of for the purpose of avoiding Federal income taxes on its sole shareholder by allowing earnings and profits to accumulate instead of being distributed, and imposed the accumulated earnings tax on the petitioner's 1967 and 1968 accumulated taxable income. He made certain other adjustments which have been conceded. Prior to trial, the petitioner submitted to the Commissioner a statement which it claimed constituted the grounds which justified the accumulation of its earnings and profits in 1967 and 1968, together with the facts supporting such grounds, and it moved to shift the burden of proof to the Commissioner pursuant to section 534(a). After a hearing, the Court held that the petitioner's statement of grounds did not meet the requirements of section 534(c) and that the petitioner had the burden of proof. *174 OPINION In addition to the other taxes imposed on the income of a corporation, section 531 imposes an accumulated earnings tax on every corporation that permits its earnings and profits to accumulate beyond the reasonable needs of the business for the purpose of avoiding income taxes on its shareholders. The tax is imposed on the accumulated taxable income of such corporations. Accumulated taxable income is computed by subtracting from taxable income, among other items, the earnings and profits retained for the reasonable needs of the business. Sec. 535. In this case, the controversy concerns the amounts of Mead's earnings and profits for the years 1967 and 1968 which were required to meet its reasonable business needs. The reasonable needs of a business include its reasonably anticipated needs. Sec. 537(a)(1). The amount of the reasonable needs of a business is inevitably a factual question to be answered in the light of all the surrounding facts and circumstances. Faber Cement Block Co.,50 T.C. 317 (1968). *175 It is not for us to substitute our judgment for that of the businessman as to what were the needs of his business ( John P. Scripps Newspapers,44 T.C. 453 (1965)), but we must be satisfied, after an examination of all the evidence, that during the year, he did in fact set aside earnings and profits for the purpose of meeting anticipated needs of the business--we must be convinced that the claim is not merely an after-thought to justify the failure to distribute earnings and profits ( Smoot Sand & Gravel Corp. v. Commissioner,274 F. 2d 495 (4th Cir. 1960), affg. a Memorandum Opinion of this Court, cert. denied 362 U.S. 976 (1960); Faber Cement Block Co.,supra).
The parties are in agreement as to the amount of Mead's working capital at the end of 1967 and 1968, but they disagree as to how much of such working capital was required to meet Mead's business needs for those years. The petitioner argued that it was all required to meet its costs of daily operations, its anticipated expansion, and its need to set aside certain funds to protect itself against anticipated risks. The parties agreed that the petitioner needed funds *176 for operations during one business cycle and that the Bardahl[5] formula should be used to measure the extent of its need for funds for such purpose, but they disagreed over certain rules to be used in applying the formula. The Bardahl formula is used to compute the amount of operating capital needed for one business cycle. Magic Mart, Inc.,51 T.C. 775 (1969). The petitioner argued that peak, instead of average, accounts receivable should be used in the Bardahl formula to compute the length of the business cycle. It maintained that it needed sufficient operating capital to meet its expenses during the maximum period of the year when receivables were outstanding. Its position would result in concomitantly greater expenses than would be achieved *177 by using the average accounts receivable and, accordingly, would provide justification for larger accumulations of working capital. However, the record contains no justification for the petitioner's position that longer periods of time are required to collect larger amounts of accounts receivable. Moreover, no testimony was presented that the petitioner's regular receipts were inadequate to cover expenses during any of its business cycles, and an examination of its monthly accounts reveals that, in general, its current expenses could be met easily by its operating revenues. For every month but 3 in 1967, and for every month in 1968, the petitioner's revenues substantially exceeded its expenses. In addition, for both years, the petitioner's monthly cash balances were two to four times as great as its current expenses. Also, during such years, the petitioner used only 32 and 24 percent, respectively, of its maximum available cash reserves. Such circumstances indicate that the use in the formula of peak receivables would exaggerate the petitioner's need for operating capital, and that the use of average receivables provides amply for such need. In another dispute over the application *178 of the Bardahl formula, the Commissioner argued that the receivables should never include amounts due from the petitioner's shareholders, officers, and employees, since such accounts were not generated by business operations. However, such accounts do drain working capital from a business and may be a legitimate business activity. Sec. 1.537-2(c)(1), Income Tax Regs.; Faber Cement Block Co.,supra.The Commissioner did not raise the issue whether these particular accounts were in fact related to the business, and accordingly, we conclude, under these circumstances, that such accounts should be included with the petitioner's other receivables. The Commissioner next maintained that the time allowed the petitioner for the payment of accounts payable should be taken into consideration in applying the Bardahl formula. To the extent that the payment of expenses may be postponed as a result of credit arrangements, the need for operating capital is reduced ( Smoot Sand & Gravel Corp. v. Commissioner,241 F. 2d 197 (4th Cir. 1957), revg. on another issue a Memorandum Opinion of this Court, cert. denied 354 U.S. 922 (1957)); *179 and the failure to take into consideration such arrangements would result in overstating the amount of operating capital needed for a business cycle. Accordingly, we are convinced that credit arrangements must be taken into consideration in applying the Bardahl formula. The petitioner contended that in applying the Bardahl formula, an adjustment for inflation should be included. However, although the petitioner's expenses increased over the years, it offered no evidence to establish that the increases were due to inflation, and not to some other cause, such as increased business activities. Moreover, it first raised this issue in its brief so that the Commissioner had no opportunity to question the witnesses as to the cause of the increases in the costs of operation. Accordingly, we conclude that the issue was not timely raised and that the petitioner has failed to establish that it is entitled to any such adjustment. We express no opinion as to what our conclusion would be had the issue been properly raised and supported by convincing evidence. In accordance with our conclusions, the amount of operating capital needed by the petitioner for a business cycle during 1967 *180 and 1968 is computed as follows: 1967
1968
1. Yearly revenues
$3,543,954
$3,937,894
2. Average accounts receivable
$ 299,772
$ 354,767
3. Turnover rate of average
accounts receivable
(line 1 / line 2)
11.82
11.10
4. Days in accounts receiv-
able cycle
(365 / line 3)
31
33
5. Accounts receivable cycle
as a percent of year
(line 4 / 365)
8.49
9.04
6. Yearly expenses
$3,240,051
$3,572,050
7. Expenses for one ac-
counts receivable cycle
(line 6 X line 5)
$ 275,080
$ 322,913
8. Average accounts payable
$ 213,380
$ 175,807
9. Turnover rate of average
accounts payable
(line 6 / line 8)
15.18
20.32
10. Days in accounts payable
cycle (365 / line 9)
24
18
11. Difference in accounts re-
ceivable cycle and ac-
counts payable cycle
(line 4 - line 10)
7
15
12. Non-deferred expenses for
one accounts receivable
cycle as a percent
(line 11 / line 4)
22.58
45.45
13. Operating capital needed
for one business cycle
(line 7 X line 12)
$ 62,113
$ 146,764
The petitioner argued that the always present possibility of a labor strike justified accumulating earnings in 1967 and 1968 to meet 2 months of fixed operating costs. The *181 evidence showed that the petitioner was subjected to a disastrous labor strike in 1953 or 1954 and that a strike occurred in 1970, which closed down much of the trucking industry. In 1967 and 1968, no member of the trucking industry knew whether it would be struck, but any of them might be. In the light of such circumstances, we are satisfied that in 1967 and 1968, the petitioner did have a reasonably anticipated need to provide for 1 month's fixed operating costs in each such year. Dielectric Materials Co.,57 T.C. 587 (1972); John P. Scripps Newspapers,44 T.C. 453 (1965); compare Cheyenne Newspapers, Inc. v. Commissioner,494 F. 2d 429 (10th Cir. 1974), affg. a Memorandum Opinion of this Court. From 1963 through 1968, the petitioner had an average of $107,516 of uninsured losses each year. Such evidence amply supports the petitioner's contention that it was justified in allocating $100,000 in each of 1967 and 1968 to cover such losses. Magic Mart, Inc.,51 T.C. 775 (1969). The petitioner did not furnish the costs of commercial insurance on its terminals and equipment, but indicated that it considered such *182 costs prohibitive. The Commissioner contended that, in the absence of a showing of the cost of commercial insurance, the petitioner had failed to establish a reasonable need for the self-insurance reserve. However, proof of the cost of commercial insurance is not essential to establish the reasonableness of a fund set aside for self-insurance. Moreover, the decision to self-insure a certain amount of its losses is peculiarly within the discretion of the petitioner's management, and no circumstances were presented that would justify substituting our judgment for theirs. Cf. Magic Mart, Inc.,supra.
The petitioner maintained that during 1967 and 1968, its plans for replacement of equipment and expansion of facilities justified accumulating earnings and profits. Such plans for future needs must be "specific, definite, and feasible"; "uncertain or vague" plans do not justify accumulations. Sec. 1.537-1(b)(1), Income Tax Regs. The reasonable needs of the business during the years at issue are to be determined on the basis of the situation existing during such years, but events in later years may throw light on the earlier years. Dixie, Inc.,31 T.C. 415 (1958), *183 affd. 277 F. 2d 526 (2d Cir. 1960), cert. denied 364 U.S. 827 (1960). The petitioner argued that it planned equipment replacements 2 years in advance, and that accordingly, it was entitled to accumulate in 1967 and 1968 the amounts that were actually spent in the later years. However, the petitioner failed to produce any evidence showing that in 1967 and 1968, it actually had any plans to spend the amounts that were in fact spent in the later years. Its evidence showed that, at the end of 1967 and 1968, the petitioner did not know what it would spend on equipment in the later years and only estimated that it would spend $175,000 yearly. Such estimate appears to be based on the average of expenditures for equipment since 1963. The Commissioner argued that the petitioner did not have the requisite plan for equipment replacement, since it only replaced equipment as capital became available. However, it was established that the petitioner had a regular plan for equipment replacement, and even though it did not purchase equipment until it had the funds to do so, it was able throughout the years 1963 through 1968 to continue its plan of equipment replacement. *184 Compare Atlantic Properties, Inc.,62 T.C. 644 (1974), on appeal (1st Cir., Nov. 13, 1974). The petitioner urged that it needed to accumulate an additional $600,000 during 1968 to provide for converting its gas tractors to diesel engines. The evidence showed that, in 1968, the petitioner was anticipating replacing gas with diesel engines at some time in the future, and that in 1969, it purchased more diesel engines than it had in any prior year, although it also purchased some gas tractors in that year. Such evidence fails to show that the petitioner had in 1968 any specific plans to purchase diesel engines, and none of its 1968 accumulation may be justified on that ground. Atlantic Properties,Inc.,supra. However, we are convinced that in the light of the petitioner's past practice, it did have in 1967 and 1968 a reasonable need to accumulate $175,000 each year for the anticipated replacement of equipment. When the petitioner purchased the Burnside rights, it planned to acquire a terminal in Dayton, Ohio. Labor considerations caused it to delay such acquisition for 2 years, and in 1966, it entered into a lease for a terminal. In that year, it made *185 some inquiries concerning land on which it could build its own terminal. The petitioner argued that its efforts continued throughout 1967 and 1968 and culminated in its move to its own terminal in 1970. However, the petitioner failed to offer evidence showing any activity on its behalf in 1967. In addition, the evidence failed to show that in such year, the petitioner had any plan regarding the amounts to be spent on the terminal. Mead's treasurer testified that his estimate of the cost of building the Dayton terminal was based on the costs incurred in building the terminal at North Reading, Mass., but his estimate could not have been made in 1967, since the North Reading terminal was not built until after 1967. Such evidence falls short of establishing that the petitioner, in 1967, had a definite plan to construct the Dayton terminal. Cheyenne Newspapers, Inc. v. Commissioner,supra;Novelart Manufacturing Co.,52 T.C. 794 (1969), affd. 434 F. 2d 1011 (6th Cir. 1970), cert. denied 403 U.S. 918 (1971). The petitioner argued that completion of the Dayton terminal within 3 years after 1967 indicates that it had *186 a plan to build a terminal in that year. Implementing alleged plans within a few years of the year at issue is some evidence that the plan did actually exist in the year at issue. Faber Cement Block Co.,50 T.C. 317 (1968). However, in view of the circumstances that the construction contract was not made until 1969 and that during 1967, the petitioner did nothing to further its acquisition of a terminal in Dayton, the ultimate construction of the terminal is insufficient to show that in 1967 the petitioner had a plan to build the Dayton terminal. The petitioner claimed that it was required to set aside some of its earnings and profits in 1967 and 1968 for the purpose of constructing a terminal at Fort Wayne, Ind. Ever since it acquired trucking rights to Fort Wayne, the petitioner has used office space at the Arrow terminal and has had trucking arrangements with them. The petitioner argued that its long-standing association with Arrow does not undermine its claim that it planned to construct its own terminal. It contended that Arrow was financially unsound and might become bankrupt at any time. However, the long-standing arrangement with Arrow casts some doubt *187 on the petitioner's claim that it had a plan to construct its own terminal. In addition, even if it contemplated building its own facility in the event Arrow discontinued business, such an indefinite possibility does not constitute a plan justifying the accumulation of earnings and profits. Atlantic Properties, Inc.,supra.It also adverted to the fact that it acquired a lot adjoining the Arrow terminal. Yet, the petitioner failed to establish any evidence indicating that such lot was acquired for the purpose of constructing a terminal, and none has in fact been erected in the intervening time. Barrow Manufacturing Co. v. Commissioner,294 F. 2d 79 (5th Cir. 1961), affg. a Memorandum Opinion of this Court, cert. denied 369 U.S. 817 (1962). In the light of these circumstances, we are not convinced that the petitioner actually had a specific plan in 1967 or 1968 to construct a terminal at Fort Wayne. The parties agreed that the petitioner had a reasonable need for $147,551 in 1967 to complete the terminal in North Reading. In his brief, the Commissioner conceded that, in 1968, the petitioner had a reasonable need for $60,000 for the expansion *188 of the Norwalk terminal and $193,000 for the construction of the terminal at Dayton. Taking such facts into consideration, together with the conclusions which we have reached based on the evidence in the case, we hold that the petitioner's reasonable needs for 1967 and 1968 were as follows: 1967
1968
Operating capital
$ 62,113
$146,764
Strike fund
59,467
59,467
Self-insurance fund
100,000
100,000
Equipment
175,000
175,000
Dayton terminal
0
193,000
Fort Wayne terminal
0
0
Norwalk terminal
0
60,000
North Reading terminal
147,551
0
Total
$544,131
$734,231
Its 1967 working capital $969,829, less its 1967 accumulated earnings, $160,330, was in excess of its reasonable business needs, $544,131, and thus, it did not need to retain any part of its 1967 earnings. Our computation for 1968, based on the evidence of record in the case, would result in the conclusion that there is no justification for the retention of any part of the income for the reasonable needs of the business for that year. However, in his notice of deficiency, the Commissioner allowed the petitioner a credit of $78,369 for 1968, and in his brief, he concedes that such credit *189 is allowable. Accordingly, only $95,757 of the accumulated taxable income for 1968 is subject to taxation under section 531. Section 533(a) provides: (a) Unreasonable Accumulation Determinative of Purpose.--For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary. The petitioner has proffered no evidence that its excessive accumulations were prompted by reasons other than tax avoidance. To the contrary, the record contains evidence that the earnings and profits were accumulated for the purpose of avoiding taxes on the petitioner's shareholder. Throughout its history, the petitioner paid negligible dividends even though it had sufficient cash reserves and was generally a successful operation. Its sole shareholder had large amounts of taxable income in 1967 and 1968, and the failure to pay dividends resulted in *190 tax savings for him. Atlantic Properties, Inc.,62 T.C. 644 (1974). Thus, we hold that the tax under section 531 is applicable to the accumulated taxable income of the petitioner for the years 1967 and 1968, computed in accordance with our conclusions in this opinion. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect for the years at issue.↩
2. All figures have been rounded to the nearest dollar.↩
3. Working capital is current assets less current liabilities. ↩
4. For 1968, the earned surplus account is taken to include amounts transferred to the capital account in that year.↩
5. Bardahl Manufacturing Corp.,T.C. Memo. 1965-200; Bardahl International Corp.,T.C. Memo. 1966-182; see also Hardin v. United States,461 F. 2d 865 (5th Cir. 1972); Magic Mart, Inc.,51 T.C. 775 (1969); Faber Cement Block Co.,supra.↩