583 F.2d 470
 78-2 USTC P 9608
 CENTRAL MOTOR COMPANY, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
CENTRAL CREDIT CORPORATION, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
CRUCES CREDIT CORPORATION, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
RED ROCK INVESTMENT COMPANY, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
 Nos. 76-1469 to 76-1472.
 United States Court of Appeals,
Tenth Circuit.
 Argued and Submitted Aug. 2, 1977.
Decided July 31, 1978.
 
 Kendall O. Schlenker, Albuquerque, N. M. (Charles E. Anderson and Sandra Jo Craig, of Schlenker, Parker, Payne & Wellborn, Albuquerque, N. M., on the briefs), for plaintiffs-appellants.
 William S. Estabrook, III, Atty., Dept. of Justice, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Atty., Dept. of Justice, and Richard W. Perkins, Atty., Dept. of Justice, Washington, D. C., on the briefs), for defendant-appellee.
 Before SETH, Chief Judge, and HOLLOWAY and BARRETT, Circuit Judges.
 HOLLOWAY, Circuit Judge.
 
 
 1
 These are consolidated actions brought pursuant to 28 U.S.C. § 1291 for refund of federal income taxes and accumulated earnings taxes for tax years ending in 1966, 1967 and 1968. The companies involved on this appeal are Central Motor Company (Central Motor), Central Credit Corporation (Central Credit), Cruces Credit Corporation (Cruces Credit), and Red Rock Investment Company (Red Rock). Following special verdicts by a jury, judgments were entered denying recovery of the accumulated earnings taxes in question. In another part of the case, tried without a jury, the trial court held that Central Motor was not entitled to deductions taken for contributions to an employees' pension fund under 26 U.S.C. §§ 401(a) and 404(a)(3), and denied recovery of income taxes in question.
 
 
 2
 On appeal, the major contentions are: (1) the trial court erred in instructing on the accumulated earnings tax issue and the special verdicts rendered by the jury that there were unreasonable accumulations of earnings should be set aside and judgment entered for each appellant taxpayer in the full amount of the claimed refunds for lack of evidence to support any findings of unreasonable accumulations, Inter alia, (2) the trial court's order granting the government's motion to consolidate the cases for trial of the accumulation of earnings issue was erroneous, and (3) the trial judge erred in finding that the pension fund for Central Motor's employees was not operated for their exclusive benefit and in denying recovery for deductions based on Central Motor's contributions to the pension fund.
 
 
 3
 The factual background and additional issues will be treated as we discuss the appellate contentions.
 
 
 4
 * THE ACCUMULATED EARNINGS ISSUE
 
 
 5
 a. The background of the taxpayer corporations
 
 
 6
 The Internal Revenue Service in an audit of the appellants determined that each company was liable for accumulated earnings taxes for the three years in question under 26 U.S.C. §§ 531-537.[1] The taxes assessed under § 531 were paid by the companies and individual refund actions were instituted. The cases were consolidated for trial on motion of the government on the accumulated earnings issue. A jury verdict was rendered in the form of answers to special interrogatories. Their effect was to deny any refund to the taxpayers except Red Rock for 1966. The jury's responses to the special interrogatories established: (1) that each taxpayer (except Red Rock for 1966)[2] had permitted its earnings to accumulate beyond "reasonable present and future needs of the business" in each of the years in issue, (2) that tax avoidance with respect to individual shareholders was one of the purposes of such accumulations, and (3) that the amount of earnings and profits unreasonably accumulated for each year was the exact amount computed in the audit and assessed.
 
 
 7
 The IRS agent who audited the appellant corporations deemed them pursuant to Code § 1561, to be part of a "controlled group."[3] The controlling individual behind the corporations was Mr. Clair Gurley. With respect to all the appellants, Mr. Gurley or his wife owned a substantial amount of the stock during the years in question.[4] Mr. Gurley served as president of each company. At trial Mr. Gurley testified that he made the final decision on matters affecting relationships between the companies and that he was the "controlling force" behind the companies. (R.A. II, 354). Briefly, the history of the corporations involved in this appeal is as follows:
 
 
 8
 Central Motor : This is a Ford dealership in Gallup, New Mexico, around which the activities of the other corporations revolved. Mr. Gurley acquired full ownership of Central Motor in 1935 and incorporated it in 1946. In 1957, Central Motor moved to a building and other property owned by Central Credit. Central Motor is a unique dealership because a large volume of its business involves sales of pickup trucks to Navajo and Zuni Indians. Mr. Gurley estimated that 65-70% Of the sales were to Indians. During the period 1966-75, Central Motor experienced considerable expansion, both in the total volume of business and in the number of people employed. In this period, total sales rose from $2,915,000 to $10,905,000, and the number of employees climbed from 47 to 95.
 
 
 9
 Following liquidation of Central Credit in 1969, the buildings occupied by Central Motor were sold to Mr. Gurley's son and son-in-law. Central Motor then purchased the building from them in 1974. At the time of trial Central Motor was in the process of constructing a new facility which was expected to be completed in a few months. The cost of $500,000-600,000 for the new facility was being financed by Mr. Gurley himself.
 
 
 10
 In fiscal 1975 Central Motor elected to take sub-chapter S tax status so that its income at the time of trial was being taxed directly to the shareholders (including Mr. Gurley).
 
 
 11
 Central Credit : Central Credit was incorporated by Mr. Gurley in January, 1956. The nature of its business was limited to ownership of the original land and buildings which were rented to Central Motor Company. During its existence, the only acquisition beyond the original Central Motor building was a body shop in 1961. Central Credit was liquidated in 1969 as a consequence of the audit by the IRS. (R.A. II, 363).
 
 
 12
 Cruces Credit : Cruces was incorporated in 1947 in Las Cruces, New Mexico. Initially, Cruces was a finance company serving a car dealership in Las Cruces, Mesilla Motor Company, in which Mr. Gurley had a part ownership. Mr. Gurley's interest in Mesilla Motors was sold by him and Cruces Credit became dormant for several years. Cruces was revived in the late 1950s as a source of financing sales by Central Motor. Mr. Gurley stated that the sole customer of Cruces has been Central Motor. Cruces was liquidated in 1972 because of the audit. (R.A. II, 377).
 
 
 13
 Red Rock : Red Rock was incorporated in March, 1959, by Mr. Gurley's son and son-in-law, Patrick Gurley and John Schuelke. It was used as a car leasing agency until November, 1961. At that time, it was sold to Mr. Gurley, who used it as a financing company for vehicles sold by Central Motor. Red Rock was still in existence at the time of trial.
 
 
 14
 Credit Investment Company : Credit Investment is not an appellant, but serves as a depository for the pension fund of Central Motor's employees. During the period 1966-68, Credit was principally owned by Mr. Gurley's son and son-in-law. It was incorporated in 1961 after a distribution of a trust which Mr. Gurley had established for his children. Credit Investment is involved in the car financing business.
 
 
 15
 b. The general principles governing liability under § 531 for accumulated earnings.
 
 
 16
 Pursuant to Code § 532, the accumulated earnings tax of § 531 is imposed if a corporation was "formed or availed of for the purpose of avoiding the income tax with respect to its shareholders . . . by permitting (its) earnings and profits to accumulate instead of being divided or undistributed." Thus, there are two elements to the imposition of the tax: (1) intent to avoid shareholder taxes, and (2) unreasonable accumulation of earnings and profits. The taxpayers here attack the findings of unreasonableness of their accumulations of earnings but not the jury's findings that there were tax avoidance motives.[5]
 
 
 17
 The Supreme Court has recently stated the rationale for the imposition of the tax in Ivan Allen Company v. United States, 422 U.S. 617, 624-25, 95 S.Ct. 2501, 2504, 45 L.Ed.2d 435, as follows:
 
 
 18
 Because of the disparity between the corporate tax rates and the higher gradation of the rates on individuals, a corporation may be utilized to reduce significantly its shareholders' overall tax liability by accumulating earnings beyond the reasonable needs of the business. Without some method to force the distribution of unneeded corporate earnings, a controlling shareholder would be able to postpone the full impact of income taxes on his share of the corporation's earnings in excess of its needs . . .
 
 
 19
 In order to foreclose this possibility of using the corporation as a means of avoiding the income tax on dividends to the shareholders, every Revenue Act since the adoption of the Sixteenth Amendment in 1913 has imposed a tax upon unnecessary accumulations of corporate earnings effected for the purpose of insulating shareholders.
 
 
 20
 In ascertaining the reasonableness of accumulations of earnings, each business must be assessed in light of its own particular requirements. Cheyenne Newspapers, Inc., v. Commissioner, 494 F.2d 429, 432 (10th Cir.). Reasonableness of provisions made for business needs is necessarily for determination by those concerned with management of the business. Henry Van Hummell, Inc. v. Commissioner, 364 F.2d 746, 749 (10th Cir.), cert. denied, 386 U.S. 956, 87 S.Ct. 1019, 18 L.Ed.2d 102. Whether a corporation has accumulated its earnings and profits beyond the reasonable needs of its business, including its reasonably anticipated needs, is a factual determination. Oklahoma Press Publishing Co. v. United States, 437 F.2d 1275, 1277 (10th Cir.). In a refund action the taxpayer must present evidence to overcome the presumptive correctness of the Commissioner's assessment. See World Publishing Co. v. United States, 169 F.2d 186, 187 (10th Cir.). This calls for "objective evidence" from the taxpayer as to the reasonableness of any accumulation made for the purpose of anticipated needs. Oklahoma Press Publishing Co. v. United States, supra, 437 F.2d at 1277.
 
 
 21
 Pursuant to Code § 533(a), a company may accumulate income for the reasonable needs of the business. Section 537(a)(1) provides that the reasonable needs of a business shall include its "reasonably anticipated needs."
 
 
 22
 Several Treasury regulations have been promulgated to serve as guidelines for evaluating the reasonableness of an accumulation. Reg. § 1.537-1(a) adopts the standard of a "prudent businessman" in determining the needs for accumulations. Reg. § 1.537-2(b) lists several grounds that are indicative of the fact that the "earnings and profits of a corporation are being accumulated for the reasonable needs of the business." These grounds include accumulations for expansion of the business, for working capital necessary for the business, and for investments or loans to suppliers or customers necessary to the business. Reg. § 1.537-2(c) states several factors tending to show that accumulations are unreasonable. These factors include: loans to an affiliated corporation whose business is not that of the taxpayer corporation,[6] investments in properties which are unrelated to the business of the taxpayer corporation, and retention of earnings to provide against unrealistic business hazards.
 
 
 23
 Beyond the general guidelines in the statutes and regulations the courts have pointed to numerous other factors tending to affect the reasonableness of an accumulation.[7] These factors will be treated as we discuss the different taxpayer corporations involved in this appeal.
 
 
 24
 The basic guidelines are laid down in Ivan Allen Co. v. United States, supra, 422 U.S. at 626-28, 95 S.Ct. at 2506:
 
 
 25
 The purport of the accumulated earnings tax structure established by §§ 531-537, therefore, is to determine the corporation's true economic condition before its liability for tax upon "accumulated taxable income" is determined. The tax, although a penalty and therefore to be strictly construed, Commissioner v. Acker, 361 U.S. 87, 91 (80 S.Ct. 144, 4 L.Ed.2d 127) (1959), is directed at economic reality.
 
 
 26
 . . . What is required, then, is a comparison of accumulated earnings and profits with "the reasonable needs of the business." Business Needs are critical. And need, plainly, to use mathematical terminology, is a function of a corporation's liquidity, that is, the amount of idle current assets at its disposal. The question therefore, is not how much capital of all sorts, but how much in the way of quick or liquid assets, it is reasonable to keep on hand for the business.
 
 
 27
 We note also the following observation in the dissent of Mr. Justice Powell, in Ivan Allen concerning the penalty nature of the tax (id. at 641, 95 S.Ct. at 2513):
 
 
 28
 . . . This means, at a minimum, that doubts and ambiguities must be resolved in favor of a fair and equitable construction that is as free from the hazards of uncertainty as the statutory language and purpose will allow.
 
 
 29
 With these principles in mind we turn to the separate cases of the taxpayers before us.
 
 
 30
 c. The Central Motor accumulated earnings case
 
 
 31
 Central Motor's main contentions on this part of the case are (1) that the trial court erred as a matter of law in instructing the jury to consider the company's credit cycle on the accumulated earnings issue;[8] and (2) that the evidence is insufficient to support the jury's verdict that Central Motor allowed its earnings and profits to be accumulated unreasonably. (Appellant Central Motor's Brief in Chief 8, 16-17). Central Motor asks that we reverse the judgment and allow all of its claims for refund in full, or alternatively, that we remand the earnings tax issue for trial separately from that of the other companies. (Id. at 48-49).
 
 
 32
 The parties are not in dispute over the basic approach to one phase of the accumulated earnings tax issue. That is the use of the operating cycle method developed in Bardahl Manufacturing Corp., 24 T.C.M. 1030; see Apollo Industries, Inc. v. C. I. R., 358 F.2d 867 (1st Cir.); Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, 8-16 (3d ed.). The Government presented its case on this basis and Central Motor says that the case law beginning with Bardahl Manufacturing "has developed an approximate method for determining working capital which bases the amount of necessary working capital on a taxpayer's business needs for one 'operating cycle.' " (Appellant Central Motor's Brief in Chief, 15; see id. at 17). Requirements for working capital (current assets less current liabilities, Schenuit Rubber Co. v. United States, 293 F.Supp. 280, 290 (D.Md.)), are determined by this operating cycle method in Bardahl Manufacturing Corp., which the Tax Court there defined as follows (24 T.C.M. at 1034):
 
 
 33
 Manufacturing's operating cycle, consisting of the period of time required to convert cash into raw materials, raw materials into an inventory of marketable Bardahl products, the inventory into sales and accounts receivable, and the period required to collect the outstanding accounts, averaged approximately 4.2 months during the 4 years here in question.
 
 
 34
 Petitioner required working capital as of the end of each of the years in question at least in an amount sufficient to cover its reasonably anticipated costs of operation for a single operating cycle. Since its operating cycle during the period 1956 through 1959 averaged approximately 35 percent of a year, its working capital requirements for the continuation of its normal operations amounted to approximately 35 percent of its reasonably anticipated (and steadily increasing) total annual operating costs and cost of goods sold as of the end of each of the years in issue.
 
 
 35
 The controversy here is not over use of this operating cycle method, but over the application of a refinement to it which was developed in Bardahl International Corp., 25 T.C.M. 935. This refinement calls for the consideration of the period of time during which suppliers extend credit or permit deferral of payments. In Bardahl International, supra, 25 T.C.M. at 946, the Tax Court agreed with the Government that "consideration should be given, particularly under the circumstances existing here, to the length of time petitioner's accounts payable for the purchase of inventory remained unpaid; in other words the average period of credit extended petitioner by Manufacturing, its supplier." Applying this refinement to Central Motor the Government essentially argues for reducing the operating cycle from 40.15 days[9] by 30 days because suppliers extended credit for such a period. (See Government Exhibits 70-72, pp. 22-23). Central Motor says such a reduction is erroneous as a matter of law and is not supported by the evidence.
 
 
 36
 We must agree with the basic position of Central Motor that the evidence did not justify the drastic reduction in the allowance for working capital which resulted from the way the Government used the credit cycle factor. As noted, the Government's allowance for working capital was based on a reduction of the operating cycle of Central Motor from 40.15 days to 10.15 days. This in turn was based on what the revenue agent said was the "average credit period which has been extended by the suppliers. This was determined to be thirty days." (R.A. II, 490).[10] From that premise, the Government argues that the available working capital was excessive and that the allowance for working capital should be reduced to about one quarter of the amount which the operating cycle method would otherwise have indicated. On the other hand, Central Motor says that during the years in question it needed more working capital than was available. The conflicting figures in evidence were as follows:
 
 
 37
 The Government contends that the credit cycle should be considered while Central Motor says that it should not. From the calculations just noted the Government concludes that there was an excess of working capital, while Central Motor concludes that there was a deficit of working capital. The sharp contrast between these conclusions can be shown as follows:
 
 
 38
 FYE June 30 . . . . . 1966 1967 1968
 
 
 39
 The Government's calculation of $ 169,245 $ 224,991 $ 172,873
 
 
 40
 excess of working capital (based
 
 
 41
 on the differences between line
 
 
 42
 (2) and line (3) above)[12]
 
 
 43
 Central Motor's calculation of 81,170 91,160 141,268
 
 
 44
 working capital deficit (based
 
 
 45
 on the differences between
 
 
 46
 line (1) and line (3) above)From this second set of calculations the drastic effect of using the credit cycle as proposed by the Government is apparent. But most important, we feel, is the fact that this is done by mechanically reducing the operating cycle, as in 1966, from 40.15 days to 10.15 days on the sole basis of the determination by the revenue agent that this was "the average credit period extended by the suppliers." (R.A. II, 490). As noted, Mr. Gurley testified that general suppliers were paid on a monthly or 30-day billing except for new automobiles which were paid for by cash paid on drafts. (R.A. II, 383).
 
 
 47
 The Government argues that the growing body of case law holds that any computation of working capital requirements must take into account the credit extended to a corporate taxpayer by its suppliers, citing Bardahl International, inter alia. (Brief for the Appellee, 32). It is true that several cases have applied the credit cycle refinement.[13] But the Government's case here is not presented on a record like that in Bardahl International. There it was particularly stressed by the court that credit to the taxpayer corporation was extended by Bardahl Manufacturing; that Ole Bardahl was president and principal stockholder in both companies; and that in practice Bardahl International paid all other obligations first and then paid Bardahl Manufacturing "when it had the money to do so." 25 T.C.M. at 946. Moreover the average credit period in days extended specifically by Bardahl Manufacturing was determined, based on the turnover of accounts payable, for each year in question. Id. at 937. Obviously, the need for working capital was greatly diminished by the credit arrangements in such a case.
 
 
 48
 There is no such proof in our record only the general 30-day reference to credit from suppliers, with no indication that Central Motor had any control over credit extended, or any assurance of it, and no evidence of the actual turnover of payables.[14] Working capital allowances based on the theory which the Government offers, without evidentiary support, might well mean that " . . . the Company would keep one step ahead of the sheriff if everything went right; they would result in prompt insolvency if anything went wrong." Schenuit Rubber Co. v. United States, 293 F.Supp. 280, 290 (D.Md.); see Libin, Accumulations After Bardahl: Developments Affecting the Accumulated Earnings Tax, 30 N.Y.U.Inst.Tax. 1143, 1154 (1972).[15]
 
 
 49
 The Government also relies on C. E. Hooper, Inc. v. United States, 539 F.2d 1276 (Ct.Cl.). There the credit cycle was considered in applying the operating cycle method for determining working capital requirements. However, the court pointed out the necessity of specific consideration of three classes of payables (interviewers' salaries, other salaries, and non-salary payables), of the percentage of total expenses within such class, and of the time within which each class of obligation was actually paid. Id. at 1282. Thus the actual impact of the credit cycle on the need for working capital was shown, which was not the case as to Central Motor.
 
 
 50
 We are persuaded that the evidence was insufficient to justify submission to the jury of the credit cycle theory and the Government's calculations of working capital based thereon. Those calculations called for a drastic reduction of the working capital allowance by about 75% From what the operating cycle method would otherwise show as justified. This reduction was based merely on evidence that a 30-day billing was used by "general suppliers." There were no details as to the actual impact of credit extended such as the payables turnover reflecting actual use of credit in paying bills to particular categories of creditors, and no evidence as to Central Motor's control over any credit extensions or assurance of them, or the steady availability of credit in actual practice.15a And we must remember we are dealing with a tax penalty statute which is to be strictly construed. See Ivan Allen Co. v. United States, supra, 422 U.S. at 627, 95 S.Ct. 2501.
 
 
 51
 Since the credit cycle theory had no basis in fact, we are convinced that the verdict against Central Motor on the earnings tax issue cannot stand. United States v. Fenix and Scisson, Inc., 360 F.2d 260, 262 (10th Cir.), cert. denied, 386 U.S. 1036, 87 S.Ct. 1474, 18 L.Ed.2d 599.[16] We do not hold that the credit cycle cannot be considered in determining the operating cycle and a reasonable working capital allowance, if evidence is present which justifies consideration of the credit cycle, as discussed earlier. On the remand we feel necessary, it will be open to the parties to develop a fuller factual record pertaining to the operating and credit cycle of the company. See Oklahoma Press Publishing Co. v. United States, 437 F.2d 1275, 1280 (10th Cir.); Donald v. Madison Industries, Inc., 483 F.2d 837, 845-46 (10th Cir.).
 
 
 52
 On the other hand, we do not agree with Central Motor that the record is such as to support judgment notwithstanding the verdict in its favor. We cannot say the evidence points all one way so as to be susceptible of no reasonable inference to sustain the Government's position. Wilkin v. Sunbeam Corp., 377 F.2d 344, 377 (10th Cir.), cert. denied, 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 464. For aside from the operating cycle and credit cycle issues with respect to working capital, there are other factors which are present to raise factual questions as to the reasonableness of the accumulations of earnings. There were substantial loans made by Central Motor to the other corporations controlled by Mr. Gurley, Central Credit, Red Rock and Cruces Credit, which may indicate unreasonable accumulations. See Reg. § 1.537-2(c)(3). (See E. g., Government Ex. HH, R.A. IV, 951). Central Motor makes a substantial argument that their business was "that of the taxpayer corporation," so that under the regulation this is not a factor indicating unreasonable accumulations. However, clearly as to Central Credit whose business was limited to ownership and leasing of a building to Central Motor, it is arguable that its business was not that of the taxpayer. Treas.Reg. §§ 1.537-2(c)(3) and 1.537-3. See Mead's Bakery, Inc., 23 T.C.M. 607, 616-17, aff'd. on this issue but reversed on other grounds, 364 F.2d 101, 106 (5th Cir.). And Mr. Gurley's testimony did not identify the purpose of particular loans between Central Motor and the other companies. (R.A. II, 401-402).[17]
 
 
 53
 Furthermore in the years 1966, 1967 and 1968 Central Motor paid dividends, respectively, of only $5,334, $5,299 and $5,294 leaving earnings, after taxes and cash dividends, of $21,140.94, $24,707.11 and $30,088.59. It is arguable that these were relatively small dividends which, with other factors, tend to show unreasonable accumulations. See W. L. Mead, Inc. v. C. I. R., 551 F.2d 121, 122 (6th Cir.).
 
 
 54
 Countervailing arguments are advanced by Central Motor to justify the retention of earnings. First, it says that the accumulations were needed for expansion of the business. However, despite general testimony by Mr. Gurley of a need for expansion in 1966-1968, and proof of a considerable amount of later acquisitions, see Faber Cement Block Co., 50 T.C. 317, 333, there was evidence that the expansion plans were indefinite and that there were no plans drawn at that time. It is arguable from the evidence that specific, definite and feasible plans were lacking, see Reg. § 1.537-1(b)(1), and that there was insufficient objective evidence that the taxpayer intended to carry out its spending program within a reasonable period of time. Oklahoma Press Publishing Co. v. United States, 437 F.2d 1275, 1277 (10th Cir.). Second, Central Motor argues that business hazards strikes and self-insurance required the accumulations made. While these factors are legitimate grounds for accumulations, again the evidence was such that we cannot say that a judgment n. o. v. is justified. Thus, none of the alternative grounds argued is sufficient to call for a judgment n. o. v. for Central Motor; these issues will remain open for the trial on remand and further evidence is not foreclosed. Oklahoma Press Publishing Co., supra, 437 F.2d at 1280.
 
 
 55
 In sum, we feel that the verdicts and the judgment against Central Motor on the claim for refund of the accumulated earnings tax cannot stand because of the basic defect in the record on operating and credit cycle matters. We cannot agree with Central Motor, however, that it is entitled to judgment notwithstanding the verdicts. Accordingly, the judgment as to Central Motor denying its claim for refund of the accumulated earnings tax is set aside and the cause is remanded for a new trial on that claim.
 
 
 56
 d. The Cruces Credit and Red Rock accumulated earnings cases
 
 
 57
 Both Cruces Credit and Red Rock, the finance companies, argue that there was error in the criteria available to the jury to answer the special verdicts and insufficient evidence to support those verdicts. More specifically they say that (1) the Bardahl Manufacturing operating cycle formula is not applicable to the finance companies; (2) if the Bardahl formula applies, the revenue agent erred in his application of it, and (3) the trial court erred in consolidating the earnings tax cases for trial. (Appellants' Brief in Chief for Cruces Credit, Red Rock and Central Credit, 8, 11, 15). The taxpayers say that they are entitled to judgment in full for their refunds on this record, or in the alternative the cases should be remanded for separate trials with proper instructions. (Id. at 33).
 
 
 58
 First, we return to the argument that the operating cycle concept as a matter of law is not applicable to finance companies. It is true that several courts have expressed the view that the concept is not applicable to certain non-manufacturing companies.[18] Nevertheless, the Bardahl formula has been applied, with various adaptations, to non-manufacturing concerns in several instances.[19] In particular we are persuaded by Cataphote Corp. of Mississippi v. United States, supra, 535 F.2d at 1234-35, where the operating cycle concept was applied to a truck leasing corporation. We feel that the leasing contracts in that case are comparable to the finance contracts here. Likewise, C. E. Hooper, Inc. v. United States, supra, 539 F.2d at 1281-82, is convincing in its adaptation of the operating cycle concept to a market analysis organization, by treating the time required for production of reports as equivalent to production of inventory by a manufacturer. While we find no case of specific application of the operating cycle concept to a finance company, we believe the method can be adopted, focusing on the cycle from investment of cash in the car sales contracts until the point when the sums invested are recovered as cost.[20] Thus, we do not agree that the Bardahl type of approach for determining a reasonable working capital allowance is not permissible for these finance companies, as a matter of law.
 
 
 59
 Second, we have the question whether the Government's working capital calculations using the Bardahl approach were otherwise in error, as the taxpayers also contend. We must agree that none of the calculations presented by the Government can support the verdicts against Cruces Credit and Red Rock.
 
 
 60
 The revenue agent presented at trial a series of computations based on the cost to the finance companies of financing the purchase of a car and the total proceeds received by the companies on a sales contract. If a car cost $3,000 and the payments called for by the contract totalled $3,800 (the difference being the interest charges), the revenue agent took only the $800 difference into account. His explanation for this was that the cost to the finance company (the $3,000) somehow "washed out" against the contract total price (the $3,800). We feel that the resulting calculations of working capital needs do not reflect the "economic reality" at which the tax is directed. See Ivan Allen Co. v. United States, supra, 422 U.S. at 627, 95 S.Ct. 2501. As the taxpayers witness said, money is their "inventory." And the effect of the illogical treatment reduction of the cycle which is the basis for computing a working capital allowance produces unfounded results.[21] Hence we conclude that these Government calculations cannot support the verdicts.
 
 
 61
 At trial the revenue agent presented another approach incorporating the 30-day credit cycle. He used it as in the Central Motor case to reduce the operating cycle, and hence the working capital allowance. As we discussed in the Central Motor case, there was no evidence justifying the deduction of the credit cycle in computing working capital needs as to these taxpayers, and these calculations cannot support the verdict.[22]
 
 
 62
 Lastly, the Government says that Cruces Credit's lack of working capital needs can be demonstrated by comparing those needs as calculated by the taxpayer with available liquid assets as determined by the agent. (Brief for the Appellee, 43 at note 24). The trouble is that this approach of picking and choosing in making calculations was not the approach presented to the jury. Even if the appellate argument is correct, in fairness we cannot accept this approach because it was not presented as the basis for the Government's case at trial.
 
 
 63
 We turn finally to the taxpayers' formula and their arguments that they are entitled to judgment in their favor on the basis of the evidence. Their argument is based on the strength of their accountant's formula. He reclassified current assets from what was shown on the taxpayers' balance sheets (Plaintiff's Ex. 99 for Cruces Credit and 109 for Red Rock). He determined that the average payment period on a car sales contract was 20 months and excluded 8/20 as not payable within one year, and thus not includible as a current asset available to meet working capital needs. He concluded there were working capital deficits for both taxpayers on the basis of working capital needs arrived at by his formula. See note 21, supra, and Plaintiff's Exhibits 100 and 111, R.A. IV, 849, 886.
 
 
 64
 While his treatment of only part of the value of installment contracts as current assets may be reasonable, see Alabama Coca-Cola Bottling Co., 28 T.C.M. 635, 652 n.1, 660, we cannot agree that the evidence is susceptible of no other reasonable inference. Wilkin v. Sunbeam Corp.,supra, 377 F.2d at 347. There was evidence of the liquidity of the contracts (see R.A. III, 615, 672-73), which might serve to show their availability to meet working capital needs. There was also evidence of the periodic receipt of cash from installment payments.[23] Both factors raise factual questions as to the taxpayers' calculations and as to their working capital requirements.[24]
 
 
 65
 Moreover, there was evidence to indicate that the taxpayers' accumulations were unreasonable. There were substantial loans by the taxpayers, in some instances to shareholders and in others to affiliated companies, occurring at various times during 1966 through 1968. Treas.Reg. § 1.537-2(c)(1, 3). The record does show that the taxpayers received loans back from shareholders and affiliates which exceeded loans made by the taxpayers. However, the record does not establish the length of time that the loans were outstanding, and, thus, we cannot infer that the benefit of the loans to the taxpayers offset the benefit of the loans, and the burden of proof was on the taxpayers. World Publishing Co. v. United States, supra, 169 F.2d at 187. Furthermore, these taxpayers paid no cash dividends despite substantial earnings after taxes during the tax years in question. See Defendant's Exhibits Q and Y, R.A. II, 914, 940-41.
 
 
 66
 In sum, we are unable to agree with these taxpayers that the record entitles them to judgments n. o. v. We do conclude, however, that the verdicts and judgments against them cannot stand. Accordingly, the verdicts and judgments adverse to Cruces Credit and Red Rock on appeal are set aside and their claims for refund of the accumulated earnings taxes in question are remanded for new trials.
 
 
 67
 e. The Central Credit accumulated earnings case.
 
 
 68
 For reversal of the verdicts and judgment as to itself Central Credit argues that (1) the operating cycle concept is not applicable to rental companies such as Central Credit;[25] (2) the revenue agent, in the calculations he presented to the jury, erred in determining the liquid assets available to meet Central Credit's working capital needs; (3) the evidence is insufficient to support the jury's verdicts against Central Credit; and (4) the consolidation of the accumulated earnings cases for trial was a prejudicial error. Central Credit asks that the judgment be reversed and that judgment be entered in its favor on its claim for refund; in the alternative it requests that the judgment be reversed, and that the cases be retried separately. We must disagree, and conclude that the judgment against Central Credit on its claim for refund of accumulated earnings taxes should be affirmed.
 
 
 69
 First, Central Credit's objection to the application of the operating cycle method need not be addressed. The revenue agent did apply the concept to Central Credit and concluded that this company as a rental company had no inventory or receivables cycles. Hence the agent concluded that Central Credit had no working capital needs under the operating cycle concept. However, he did go on to allow one year's operating expenses for working capital (R.A. II, 502, Plaintiff's Exhibit 73-75 at 16, 22, 28). On this basis he calculated working capital requirements to be $23,308 for 1966, $27,805 for 1967; and $29,238 for 1968. Ibid.
 
 
 70
 In view of these calculations which the agent finally submitted as to working capital requirements,[26] we feel that any error in the references to the operating cycle formula with respect to Central Credit was harmless. There was arguably prejudice to Central Credit by the first conclusion the agent stated, namely that under the operating cycle concept the company had no inventory or receivables cycles and hence no working capital needs. We are satisfied, however, that there was no prejudicial error on this point calling for a reversal in view of the working capital allowances for one year's operating expenses made by the agent.
 
 
 71
 Second, Central Credit claims error in the revenue agent's determination of liquid assets available to meet its working capital needs. The agent relied on figures stated in Central Credit's balance sheets filed with its tax returns and made no independent attempt to classify assets as long-term or short-term. Central Credit contends that approximately $200,000 of liabilities classified as noncurrent on the balance sheet, and also in the agent's calculations, should have been treated as current liabilities. Based on what it says should be a proper reclassification, Central Credit argues that there was not sufficient working capital available in any of these tax years to meet the working capital requirements allowed by the Government. Central Credit's position and that of the Government are demonstrated by these figures:
 
 
 72
 1966 1967 1968
 -------- -------- --------
The Government's calculations of $ 23,308 $ 27,805 $ 29,238
 necessary working capital (from
 Plaintiff's Ex. 73-75)
The Government's calculations of 182,838 177,797 202,832
 available working capital
 (Government's Ex. AA)
Central Credit's calculations of 9,634 4,324 11,902
 available working capital (from
 Plaintiff's Ex. 95)
 
 
 73
 Despite the classifications on the balance sheet, Central Credit's accountant, Mr. Petranovich, testified that the loans were represented by demand notes payable on request and that such obligations should be regarded as current liabilities. (R.A. II, 465). The company's expert accounting witness, Mr. Rogoff, disagreed with the revenue agent's reliance on the balance sheet and said that it was improper accounting practice to classify such notes as noncurrent liabilities.
 
 
 74
 We do not feel that the testimony on accounting practices is controlling as a matter of law or that it compels the inference drawn by the taxpayer. As the Court stated in Ivan Allen Co. v. United States, 422 U.S. 617, 635, 95 S.Ct. 2501, 2510:
 
 
 75
 It is no answer to suggest that our decision here may conflict with standard accounting practice. The Court has not hesitated to apply congressional policy underlying a revenue statute even when it does conflict with an established accounting practice. See, E. g., Schlude v. Commissioner, 372 U.S. 128, (83 S.Ct. 601, 9 L.Ed.2d 633) (1963); American Automobile Assn. v. United States, 367 U.S. 687, 692-694, (81 S.Ct. 1727, 6 L.Ed.2d 1109) (1961). It is of some interest that the taxpayer itself, for the tax years under consideration, reflected the market value as well as the cost of its marketable securities on its balance sheets.
 
 
 76
 Thus, the taxpayer's balance sheets do serve as some evidence that it treated its assets and liabilities in a certain manner. Furthermore, such treatment was the consistent pattern followed by Central Credit over the years in question. In addition, the taxpayer's accountant, Mr. Petranovich, testified that some demand loans were carried over from year to year (R.A. II, 465-66), and the taxpayer did not establish the portion of such loans not carried over from year to year. The taxpayer's witness, Mr. Rogoff, did testify that even demand notes carried over from year to year should be treated as current liabilities (R.A. III, 571-72), but again the jury was not bound by his position on the proper treatment.
 
 
 77
 In Firstco, Inc. v. United States, 430 F.Supp. 1193 (S.D.Miss.), the court accepted a revenue agent's determination that the taxpayer could not justify accumulations on the basis of need to cover demand notes in similar circumstances. As in our case, the notes in Firstco bore interest, no demand for payment had been made, and "(f)rom time to time these notes were reduced, added to or renewed." Id. at 1197. The court looked beyond the label of the demand notes to the actual admitted facts that no demand had been made and that none was expected. Id. at 1202. See Apollo Industries, Inc. v. C. I. R., supra, 358 F.2d at 871.
 
 
 78
 Central Credit alternatively argues that if the Government was correct in treating the demand notes payable as noncurrent assets, then the comparable demand notes receivable by Central Credit from the related companies should also be treated as noncurrent assets. (Appellants' Reply Brief of Central Credit, Cruces Credit and Red Rock, 8-9). In the circumstances of this case the jury was not bound so to find and could instead find that the taxpayer intended to treat the latter notes as it had treated them on its balance sheets. The evidence was sufficient to support the inference that Central Credit was in a position to demand payment on these receivables and to delay payment of its obligations to the related companies for some time. We find no error in connection with the Government's presentation on these matters and no compulsion from the evidence to rule in Central Credit's favor in disregard of the jury's verdicts.
 
 
 79
 Lastly, we are not persuaded in Central Credit's case that the evidence was insufficient to support the verdicts. We have noted the approach of the revenue agent in making allowances for working capital needs based on a year's operating expenses. The taxpayer presented no alternative computations. Moreover, there were sizeable loans to related companies, which loans substantially exceeded loans back to the taxpayer from those companies. See Reg. § 1.537-(2)(c)(3). In addition, no cash dividends were paid, while there were earnings after taxes of $19,054 in 1966, $21,444 in 1967 and $22,292 in 1968. (Government Exhibit Q, R.A. IV, 914).
 
 
 80
 In sum, we are satisfied that the record supports the verdicts and the judgment as to Central Credit, which we affirm.
 
 
 81
 f. The claim of error in the consolidation of the accumulated earnings cases for trial.
 
 
 82
 The taxpayers each challenge the consolidation of their cases on the accumulated earnings issue for trial. Under Rule 42(a), F.R.Civ.P., consolidation may be ordered by the court if the actions involve common questions of law or fact. The taxpayers argue that the Rule was not satisfied because separate corporate entities and separate liabilities were involved and because there were no common questions of law or fact. And they say that there was confusion at the trial and therefore prejudice to the parties.[27]
 
 
 83
 We realize that consolidation is not required if "(t)he only common denominator involved in the complexities and interrelationships of the various proceedings is (one person's) involvement." American Employers' Insurance Co. v. King Resources, Co., 545 F.2d 1265, 1269 (10th Cir.). Here, however, the existence of a business relationship among the companies is a common question of fact relevant to the loans between related companies and their accumulations. There are also common questions of law and fact concerning whether there was a tax avoidance motive behind the accumulations, which questions in each case are related to the potential individual tax liabilities of Mr. and Mrs. Clair Gurley.27a Thus we cannot agree that the conditions of the Rule as to common questions of law or fact were not met.
 
 
 84
 Nor do we agree that prejudice has been shown to the taxpayers by the joint trial. The exhibits showing working capital, computation, and intercompany loans were separately presented for each of the taxpayers; the instructions made clear the separate consideration required for each case (Orig. R. X, 459); and the special verdict forms required separate findings as to each taxpayer. We find no prejudice justifying reversal, and no error or abuse of discretion in the consolidation of the cases for trial.
 
 II
 THE PENSION TRUST ISSUE
 
 85
 Central Motor appeals a ruling by the trial court denying a refund claimed under Code § 401(a) and § 404(a) for contributions to its employees' profit-sharing trust plan. Following an audit by the IRS, deductions were disallowed for contributions made by Central Motor, as employer, to the trust fund during the tax years 1966-68. The additional taxes were paid and a refund action was brought. The taxpayer moved for summary judgment, and the government responded with a cross-motion for summary judgment. A supplemental stipulation of facts was filed, and some testimony was taken before the case was submitted to the trial court by agreement. In its Memorandum Opinion the court found for the Government and denied refund of the taxes. 454 F.Supp. 54, 76-1 U.S.T.C. P 9245.
 
 
 86
 Pursuant to 26 U.S.C. § 404(a)(1)(A), contributions "paid" by an employer to an employees' trust are deductible if the trust is tax exempt under 26 U.S.C. § 501(a). To be tax exempt under § 501(a), an employees' trust must be qualified under § 401(a). One requirement appearing in § 401(a)(2) is that it be impossible for the corpus or income to be used for or diverted to purposes "other than for the exclusive benefit" of the employees or their beneficiaries. See also Reg. § 1.401-1(a)(3)(iv) and § 1.401-1(b)(5)(ii). The trial court denied recovery because it found that the Central Motor plan was not thus operated for the exclusive benefit of its employees.[28]
 
 
 87
 The taxpayer argues that the trial court's ruling should be reversed because (1) the trial court erred in construing Rev.Rul. 69-494 as an "absolute test" for determining whether an employees' trust is operated for their exclusive benefit; and (2) if Rev.Rul. 69-494 is applicable, the evidence did not support the finding that the test set forth in that ruling was not met. We agree that Rev.Rul. 69-494 is not binding, but nonetheless feel that the trial court's analysis and the facts clearly support the finding that the Central Motor trust was not operated for the exclusive benefit of its employees.
 
 
 88
 The relevant facts regarding the operation of the trust fund are not in dispute and are detailed in the trial court's opinion. The profit sharing trust was adopted by Central Motor for its employees on May 31, 1962. By letter dated November 20, 1962, the IRS notified Central Motor that it had determined that the Trust met the requirements of § 401(a) and granted it tax exempt status under § 401(a). The trust was managed by four trustees, two chosen by management and two by the employees. Retirement and termination benefits have been paid by the plan as they have become due.
 
 
 89
 The investment of the trust funds was controlled by resolutions adopted by the trustees. Under the resolutions of July 2, 1962 and October 1, 1962, the funds were invested in local savings and loan associations. Pursuant to a resolution of June 27, 1963, the funds were withdrawn on July 17, 1963 from the savings and loan associations and invested in Credit Investment Company. Subsequently, at the trustees' request, Central Motor delivered directly to Credit Investment its checks each month for the amounts of the contributions required under the plan. (R.A. I 166, R.A. II 434).[29] Throughout the period in question, Mr. Gurley served as chairman of Credit Investment's board of Directors and his son and son-in-law controlled a majority of its stock. (R.A. IV 943). Mr. Gurley testified that he served the Trust in an "advisory capacity." (R.A. II 423). Moreover, as the trial court stated, "(O)nce the trust contributions were loaned to Credit, Central was benefited in that Credit used the borrowed funds to finance Central's auto sales." (454 F.Supp. at 56).
 
 
 90
 To determine whether the plan was operated for the exclusive benefit of the employees, the trial court applied the criteria developed in several rulings by the Treasury Department, primarily Rev.Rul. 69-494. In its opinion, the trial court stated (454 F.Supp. at 56):
 
 
 91
 It has been repeatedly stated that the primary purpose of benefiting employees or their beneficiaries must be maintained with respect to investments of the trust funds as well as with respect to other activities of the trust. Rev.Ruls. 73-380 (1973-2 Cum.Bull. 124), 73-282 (1973-2 Cum.Bull. 123), 69-494 (1969-2 Cum.Bull. 88). To be consistent with the exclusive benefit requirement, an investment must meet the following articulated investment requisites: (1) the cost must not exceed fair market value at the time of purchase; (2) a fair return commensurate with the prevailing rate must be provided; (3) sufficient liquidity must be maintained to permit distributions in accordance with the terms of the plan; and (4) the safeguards and diversity that a prudent investor would adhere to must be present. Rev.Ruls. Supra.
 
 
 92
 The trial court held that parts (3) and (4) of the test were not met and, therefore, that the Trust was not operated for the exclusive benefit of the employees.
 
 
 93
 Strict deference to the IRS rulings cited is not required. An " administrative interpretation based on certain rulings of less dignity than Regulations and Treasury Decisions is not to be accorded the weight given to Regulations." U.S. Truck Sales Company v. United States, 229 F.2d 693, 698 (6th Cir. 1956); 1 K. Davis, Administrative Law § 5.01, at 291 (1968). Nonetheless, the informal ruling is of some evidentiary value in interpreting the statute in the absence of any indication of congressional intent. See United States v. Hall, 398 F.2d 383, 387 (8th Cir.). We feel that the ruling is persuasive that the factors enumerated are among the proper ones to weigh. In any event, they are within the surrounding circumstances which we should consider. See Cornell-Young Co. v. United States, 469 F.2d 1318, 1324 (5th Cir.).
 
 
 94
 The requirement that the plan be operated for the exclusive benefit of the employees should not be interpreted literally. Time Oil Company v. Commissioner, 258 F.2d 237 (9th Cir. 1958); Bing Management Company, Inc., 36 T.C.M. 1633, 1636 (1977). The requirement does not preclude, in every case, investments in a business which is controlled by the same management or shareholders as the employer corporation. But it does make such transactions particularly suspect, and it does prohibit them in some cases. See Mertens Commentary § 401.4A.
 
 
 95
 The taxpayer argues that the decision to invest in Credit Investment resulted in no prejudice to the employees' interests in the plan and challenges the findings concerning the risk of the new investment arrangement.[30] It is contended that the security was adequate because the net liquid assets of Credit Investment were sufficient to cover outstanding notes, and because Mr. Gurley had given his valued personal guarantee. However, beyond the accounting definition of liquid assets, the taxpayer did not demonstrate that the assets could be quickly sold for the amounts needed to redeem the notes, as was the case with the savings and loan investment. It is true that Mr. Gurley's guarantee was shown to be highly regarded, but in view of the oral nature of some of the guarantees (only three notes were personally endorsed by Mr. Gurley) and of the possibility of his death, there was substantial risk. We cannot say that the findings concerning the lack of adequate security were clearly erroneous.
 
 
 96
 The taxpayer also attacks the finding that Mr. Gurley had de facto control of Credit Investment. In its opinion the trial court stated that "virtually all of the trust's assets were loaned to a corporation which was subject to the de facto control of the employer corporation's principal shareholder." (454 F.Supp. at 56). The taxpayer contends that Mr. Gurley's son and son-in-law, and not Mr. Gurley, were the major shareholders of Credit Investment. These points do not establish clear error in the finding because Mr. Gurley did serve as chairman of the board of Credit Investment during this period and because he had a family relationship to the principal shareholders.
 
 
 97
 The taxpayer also points out that Credit Investment paid a higher return than the trusts had received from the savings and loan associations. However, the testimony was that the rate of return paid by Credit Investment was the prevailing rate in Gallup. (R.A. II 430).[31] But such an argument does not overcome the risk factor stressed by the trial court, especially when the nature of a pension trust is kept in mind.
 
 
 98
 Bing Management Co., Inc. v. C.I.R., 36 T.C.M. 1633, is cited by the taxpayer as supporting its position. There the employer controlled another corporation to which the trust made some loans, and the court did conclude that the trust was still operated for the exclusive benefit of the employees. One loan for $25,000 was repaid with interest within four and one-half months. This loan was found to be a short-term, unneeded loan made for the accommodation of the trusts to provide income to them. A $55,884 note of the controlled company, secured by a chattel lien on a diesel generator purchased by that company, was paid with interest in installments over a two year period. In light of the continuing risks to the trusts and the benefit to Central Motor Company, both of which the trial court has noted, we do not feel that Bing Management is comparable to the case at bar.
 
 
 99
 In sum, we are satisfied that the findings of the trial court on the "exclusive benefit" issue are amply supported by the record. Therefore, the judgment against Central Motor on this claim for refund is affirmed.
 
 
 100
 Accordingly, the judgments are set aside in part and affirmed in part and the causes remanded in part, all as provided herein.
 
 
 101
 It is so ordered.
 
 
 
 [1]
 The penalty taxes for unreasonable accumulations of earnings as alleged by Government Exhibit W were as follows:
 UNREASONABLE ACCUMULATION OF EARNINGS AND
 ACCUMULATED EARNINGS TAX IMPOSED ON CENTRAL
 MOTOR CO. AND RELATED COMPANIES FOR YEARS
 1966 - 1968
 -------------------------------------------
 Alleged Accumulated
 Unreasonable Earnings
 Company Year Accumulation Tax Imposed
 ------- ---- ------------ -----------
1. Central Motor Co. FYE 6/30/66 $17,220.86 $ 4,735.74
 (Automobile FYE 6/30/67 49,237.37 13,540.23
 dealer) FYE 6/30/68 46,021.90 12,656.02
 -----------
 $30,932.04
2. Central Credit 1966 19,054.64 5,240.03
 Corporation 1967 21,444.81 5,897.32
 (Rental Corp.) 1968 22,292.25 6,130.37
 -----------
 (This corporation was $17,267.72
 dissolved in 1972)
3. Cruces Credit FYE 6/30/66 21,140.94 5,813.76
 Corporation FYE 6/30/67 24,707.11 6,794.46
 (Finance Co.) FYE 6/30/68 30,088.59 8,274.36
 -----------
 (This corporation was $20,882.58
 dissolved in 1969)
4. Red Rock 1966 18,671.43 5,134.64
 Investment Co. 1968 27,878.69 7,666.64
 -----------
 (Finance Co.) $12,801.28
 Some of the companies involved in this appeal operated on the basis of fiscal years which did not correspond to the calendar year. References in this opinion are made to the calendar year in which the fiscal year ended or to the calendar year for companies not using fiscal years.
 
 
 [2]
 Relying on § 269 of the Code, the revenue agent paired the corporations involved, thus splitting the standard $100,000 accumulated earnings credit allowed under § 535(c)(2) between the paired corporations; E. g., Red Rock and Cruces were allowed $50,000 each for 1966. The jury found in answering special interrogatories that Red Rock had not been acquired for the principal purpose of avoiding or evading the federal income tax. This meant that § 269 could not be applied and that Red Rock was entitled to a full $100,000 credit in 1966. Since its retained earnings were less than $100,000 in 1966, the accumulated earnings tax was not applicable and Red Rock's claim for a refund for 1966 was allowed. The Government did not appeal this issue
 The jury did find, however, that Red Rock permitted its earnings and profits to accumulate beyond the reasonable present and future needs of its business during 1968. Red Rock had no 1967 taxes in question.
 
 
 [3]
 The companies, in addition to the appellants in this case, which were identified as members of the controlled group were Southwest Underwriters and Lloyds of the Southwest
 
 
 [4]
 During these years Mr. and/or Mrs. Gurley owned stock in all of the appellant corporations. In 1968 either or both of them owned approximately 37% Of Red Rock's stock, and in 1966 through 1968 either or both of them owned over 50% Of the stock of each of the other appellants
 
 
 [5]
 In United States v. Donruss Co., 393 U.S. 297, 307, 89 S.Ct. 501, 507, 21 L.Ed.2d 495, the Court stated:
 It appears clear to us that the congressional response to these facts has been to emphasize unreasonable accumulation as the most significant factor in the incidence of the tax. The reasonableness of an accumulation, while subject to honest difference of opinion, is a much more objective inquiry, and is susceptible of more effective scrutiny, than are the vagaries of corporate motive.
 Furthermore § 533 creates a presumption of a tax-avoidance motive if the accumulations are unreasonable.
 
 
 [6]
 Obviously, there are some cases in which a conflict will exist between Reg. § 1.537-2(b)(5) (permitting accumulations for investment or loans to suppliers or customers if necessary in order to maintain the business of the corporation) and Reg. § 1.537-2(c)(3) (loans to affiliated corporations, whose business is not that of the taxpayer, tend to reflect unreasonable accumulations). In such cases, the business of the taxpayer corporation and whether the affiliates are suppliers or customers of this business is the determinative factor
 
 
 [7]
 See Case, Accumulated Earnings Tax Aspects of Business Expansions and Investments, 32 Tax.L.Rev. 1, 64-65 (1976)
 
 
 [8]
 In instructing the jury on the working capital question, the trial court stated (Orig. R. X, 451-52):
 In considering the reasonable needs of a business, you may consider that the corporation may retain enough earnings and profits to meet its working capital requirements. That is, enough to cover its operating expenses during a business cycle. In considering what are the reasonable working capital requirements of the corporation, you should consider the nature of the business, its credit policies, the amount of inventories and rate of turnover, the amount of accounts receivable and the collection rate of those accounts and the extensions of credit to the corporation. Working capital is generally defined as the excess of current assets over current liabilities.
 Counsel for Central Motor objected to the reference to the credit extension matter. (Id. at 471).
 
 
 [9]
 This is the 1966 calculation. In his calculations and testimony for that year and the others in question, the revenue agent considered only the inventory turnover (the time required for conversion of cash into raw materials through conversion of inventory into sales and accounts receivable), which he calculated as 40.15 days for 1966. From this he subtracted the 30-day credit cycle he relied on. He did not credit Central Motor with the time for the accounts receivable turnover (the time required for conversion of accounts receivable into cash). The latter turnover was calculated by Central Motor's accounting witness as 10.92 days for 1966. The revenue agent testified, however, that inclusion of the accounts receivable turnover in the cycle would not affect the final determination that § 531 applied. (R.A. II, 489-90)
 It is the inclusion or exclusion of the 30-day credit cycle which is crucial, as the briefs of both sides recognize.
 
 
 [10]
 Mr. Gurley testified that "general suppliers" were paid on a monthly billing, a 30-day basis. He said, however, that new automobiles were paid for on a cash basis. "They draft on us." (R.A. II, 383)
 FYE June 30 . . . . 1966 1967 1968
(1) Central Motor's calculation on $ 336,766 $ 393,262 $ 467,381
 Working Capital Needs
 (Plaintiff's Ex. 86)
(2) Government's calculation on 86,350 77,110 153,239
 Working Capital Needs
 (Plaintiff's Exs. 70, 71, 72
 at 22, 28, 34)
(3) Available Working Capital 255,595.13 302,101.88 326,112.95
 (from Plaintiff's Exs. 70-72,
 pp. 23, 29 and 35).[11]
 
 
 [11]
 These figures for available working capital for fiscal 1966, 1967 and 1968 were determined by the revenue agent. Despite some difference which Central Motor's witness had with these figures, they are accepted by Central Motor for purposes of this appeal. (Appellant Central Motor's Brief in Chief, p. 17, n.6)
 In its brief the Government relies on still different figures from its Exhibit Z. However, because the agent used the above figures both in his testimony and in the exhibits he sponsored (see Plaintiff's Exhibits 70-72, pp. 23, 29 and 35), and because the differences in the figures do not control our result, we use the figures accepted by Central Motor.
 
 
 [12]
 The figures on this line are taken from the revenue agent's worksheet determination of "current assets over current liability." The parties are in agreement that available working capital is defined by current assets minus current liabilities. The agent also treated an investment in land, which was not listed as a current asset on Central Motor's balance sheet, as an asset available to meet working capital needs because he believed that it was an investment unrelated to the business. (Plaintiff's Ex. 70-72, pp. 23, 29, 35). This property was valued on taxpayer's balance sheet at $62,346 in 1966 and 1967 and at $62,793 in 1968. The agent's treatment of this asset is not raised on appeal. Treatment of the land as an asset available to meet working capital needs still results in a working capital deficit if the 30-day credit extension is not considered
 
 
 [13]
 See, E. g., C. E. Hooper, Inc. v. United States, 539 F.2d 1276 (Ct.Cl.); Cataphote Corp. v. United States, 535 F.2d 1225 (Ct.Cl.); Bardahl International Corp., 25 T.C.M. 935; Alma Piston Co., 35 T.C.M. 464, 476; Marie's Shoppe, Inc., 36 T.C.M. 1548, 1551; Kingsbury Investments, 28 T.C.M. 1082, 1089; W. L. Mead, Inc., 34 T.C.M. 924, 929, aff'd 551 F.2d 121 (6th Cir.) (without discussion of the payables cycle); Walton Mill, Inc., 31 T.C.M. 75, 88
 
 
 [14]
 One formula suggested for the determination of the accounts payable cycle appears in Park & Gladson, Working Capital 30 (1963) and Ziegler, The "New Accumulated Earnings Tax: A Summary of Recent Developments," 22 Tax L.Rev. (1966) 77, 98-99 as follows:
 Average accounts payable
 ------------------------ X 365
 Materials purchased
 See also C. E. Hooper, supra, 539 F.2d at 1282, where a payables cycle was determined for other categories of operating expenses.
 
 
 [15]
 Central Motor's accounting witness testified that deduction of the payables cycle "would force any business to stay broke." (R.A. III, 527)
 15a In addition, the length of the taxpayer's credit cycle in Bardahl International, supra, 25 T.C.M 935, and in C. E. Hooper, supra, 539 F.2d 1276, was shorter than its receivables cycle (the period necessary to collect accounts receivable). We do not decide whether the credit cycle can reduce working capital needs to the extent that it exceeds the receivables cycle because we do not know what the length of Central Motor's credit cycle would be if properly developed by the evidence. If this problem arises on the remand we feel necessary, the trial court should admit evidence as to whether deduction of the credit cycle in excess of the receivables cycle is justified.
 
 
 [16]
 We realize there are other theories, discussed below, on which the Government challenged the accumulations of Central Motor and that they arguably could support the verdicts. However, it may well be that the jury adopted the Government's credit cycle theory in reaching its verdicts, and since the computations and consideration of the credit cycle should not have been submitted to the jury by the instructions on this record (see Note 8, supra), and we cannot be sure they were not relied on by the jury, the verdicts cannot stand. Cf. United N. Y. and N. J. Sandy Hook Pilots' Association v. Halecki, 358 U.S. 613, 619, 79 S.Ct. 517, 3 L.Ed.2d 541; Morrissey v. National Maritime Union of America, 544 F.2d 19, 26-27 (2d Cir.)
 
 
 [17]
 Central Motor also argues that there were substantial loans from the other companies to Central Credit which offset the loans made by Central Motor. We do not feel that the record clearly established the offsetting effect of the loans, and a factual question did remain as to whether the loans were some indication of unreasonable accumulations
 
 
 [18]
 See, E. g., Myron's Ballroom v. United States, 382 F.Supp. 582, 588 (C.D.Cal.), rev'd and remanded on other grounds, 548 F.2d 331 (9th Cir.) (restaurant and bar, Bardahl inapplicable to "service" companies); Inter-County Title and Trust Co. v. United States, No. S-74-150 (E.D.Cal.), 75-2 U.S.T.C. P 9845 (title and trust company); Simons-Eastern Co. v. United States, 354 F.Supp. 1003, 1008 (N.D.Ga.) (Bardahl formula plus 60 days expenses is reasonable working capital for a professional service company)
 At some points, these taxpayers argue that the Bardahl formula is not applicable to any non-manufacturing company. Appellants' Brief in Chief for Central Credit, Cruces Credit and Red Rock, 11. However, their emphasis is on the theory that the formula is not applicable to finance companies.
 
 
 [19]
 See E. g., Hardin v. United States, 461 F.2d 865 (5th Cir.) (wholesale bakery company); Magic Mart, Inc., 51 T.C. 775 (retail sales company); W. L. Mead, Inc., 34 T.C.M. 924, aff'd, 551 F.2d 121 (6th Cir.) (motor freight co.); Delaware Trucking, Inc., 32 T.C.M. 105 (truck hauling co.); Cataphote Corp. of Mississippi v. United States, 535 F.2d 1225, 1234-35 (Ct.Cl.) (truck leasing company); Bardahl International Corp., 25 T.C.M. 935 (sale company); C. E. Hooper, Inc. v. United States, 539 F.2d 1276 (Ct.Cl.) (radio surveying business); Marie's Shoppe, Inc., 36 T.C.M. 1548 (retail sales)
 
 
 [20]
 Of course, the recovery of the money usually comes in periodic installments. This factor is treated later
 
 
 [21]
 The operating cycle formula applied in the Bardahl Manufacturing case served as the basis for the revenue agent's original computations, prepared during the audit, of Cruces' and Red Rock's working capital needs. This formulation of the operating cycle incorporates two component cycles the inventory cycle and the receivables cycle. These cycles are computed as follows:
 Average inventory
 Inventory Cycle = ------------------------- X 365 days
 Annual cost of goods sold
 Average receivables
 Receivables Cycle= ------------------------- X 365 days
 Annual sales
 The Agent's original computations for Cruces and Red Rock did not attempt to incorporate the credit cycle (as discussed in the Central Motor case).
 Working capital needs are determined by the formula:
 working capital needs = (inventory cycle k receivables cycle) x
 annual operating expenses 365 days
 The parties agree on the annual operating expenses, but disagree as to the length of the inventory and receivables cycles.
 The agent determined that the length of the inventory cycle for the finance companies was zero. This determination was based on this theory that, washing out contract cost and contract price, there was no average inventory and no cost of goods (contracts) sold. Thus, his formula did not allow Red Rock and Cruces any working capital to maintain their inventory (finance contracts).
 The agent determined the receivables cycle by using annual service (interest) charges earned on all contracts to represent average accounts receivable. (R.A. II, 509-10). Annual sales were computed by adding the annual earned service charges on all contracts and the column on the return listing "other income." These figures only take into account the profit in a transaction and fail to recognize the full amount of the sale and resulting receivable.
 The sharp contrast between the taxpayers' figures regarding working capital needs and those of the Government is shown below:
 -----------------------------------------------------------------
 Working Capital Needs C r u c e § Red Rock
-----------------------------------------------------------------
 1966 1967 1968 1968
-----------------------------------------------------------------
 Government Computations $ 25,759 $ 36,363 $ 41,524 $ 26,205
 (Plaintiff's Exs. 76-78,
 pp. 25,31,37; 79-81,p.28)
 Taxpayer Computations $653,762 $839,399 $925,855 $681,619
 (Plaintiff's Ex. 101 &
 102)
 The unreasonableness of the agent's method was brought out on cross-examination. He admitted that there was no authority for "washing out" the cost of goods sold and the contract price; that the cost of the car to the finance company represented "cost of sales"; and that he could have credited the contract cost in figuring cost of goods sold and receivables, but, without explanation, he chose not to do so. (R.A. II, 507-10).
 
 
 [22]
 As discussed in the Central Motor case, the instructions permitted consideration of this credit cycle theory. Since we feel that the evidence was not such as to support such a theory, and we cannot be sure the jury did not adopt it in reaching its verdicts against the taxpayers, the verdicts and judgments cannot stand. See note 16, supra, and cases there cited
 
 
 [23]
 These installments, when paid, could be invested in interest-bearing accounts, securities, or notes. We realize that it is the general rule that a taxpayer need not be required to liquidate fixed assets used in connection with the business in order to meet working capital needs for § 531 purposes. See James W. Salley, Inc. v. United States, 76-2 U.S.T.C. P 9739, at 85, 371 (W.D.La.1976). Nonetheless, the circumstances of this case present a unique situation, where some assets (contracts) could be sold without impairing the ability to continue operations because the proceeds would be reinvested in new contracts. In fact, the taxpayers sold those contracts to banks which the banks would accept
 
 
 [24]
 Another controverted aspect of the formula for working capital needs proposed by taxpayers' expert witness was the allowance of a one week period for processing contracts. Taxpayers' witness contended that the time necessary to process the contracts represented the taxpayers' inventory cycle because money was tied up during this period. We agree that if the evidence shows that taxpayers' funds were invested for one week before the contract could be processed and reflected as a receivable, the taxpayers would be entitled to accumulate working capital for this period
 
 
 [25]
 We note that Central Credit, in its brief combined with that of Cruces Credit and Red Rock, states the more general proposition also that the Bardahl formula is not applicable to a non-manufacturing company. However, along with Cruces Credit and Red Rock, this proposition is actually argued in terms of the formula's not being applicable to rental and finance companies like these taxpayers
 
 
 [26]
 On appeal the Government does not argue the theory of the operating cycle concept as to Central Credit. Rather, it simply contends that the allowance of one year's operating expenses for working capital was reasonable
 
 
 [27]
 While we are setting aside the judgments in the Central Motor, Red Rock and Cruces Credit accumulated earnings cases on other grounds, we address this issue because of its relevance to the conduct of new trials and because of the request for separate trials on remand
 27a As noted earlier, with respect to the appellant corporations, Mr. and/or Mrs. Gurley owned a substantial amount of stock during the years in question. (See note 4, supra). Moreover, it should be noted that for the years 1966, 1967, and 1968, the Gurleys filed joint income tax returns. (See Plaintiffs' Exhibits 59, 60, and 61 in the original record).
 
 
 [28]
 In an additional ruling the trial court also rejected a contention by the Government that the arrangements involved were such that the contributions to the trust were not "paid" by the taxpayer as required by § 404(a)(1)(A). We need not consider this alternative ground for affirmance urged by the Government
 
 
 [29]
 The trial court noted these facts (454 F.Supp. at 55):
 As each contribution was received by Credit from Central, Credit executed a new, increased demand note to the trust, and its previous note was marked "paid by renewal." Each new note took into account the increased contribution and the interest to date on the prior principal. The plan never received an interest payment other than in this manner.
 Employees who became eligible to receive benefits under the plan received payments from Central. If the amount to be paid as benefits in any month exceeded the amount to be contributed by Central during that month, Credit issued a check to Central to make up the difference and also issued a note with a correspondingly reduced principal. Aside from this, Credit never made payments on the notes it issued.
 Credit's demand notes were, for the most part, unaccompanied by any written evidence of security, and its financial status was such that it did not have funds to pay the notes during any of the years in suit. Only three of the notes issued by Credit during the years 1966 through 1968 were personally endorsed by C. E. Gurley. Mr. Gurley and a trustee have testified that pursuant to a verbal commitment, Gurley's personal guarantee was understood to accompany each of Credit's notes to the trust. (R.A. II 425-26, 432-34).
 
 
 [30]
 The taxpayer points out, Inter alia, that all contributions were made to the trust in the amounts specified, that the employees entitled to distributions have all been fully paid, and that the trustees have filed all required annual forms
 
 
 [31]
 The resolutions reflected that the interest rate in the savings and loan associations was 41/2% While that obtained from Credit Investment was 5%